COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Bumgardner and Frank
Argued at Richmond, Virginia


DAVID JAMES BUNTON

                                    MEMORANDUM OPINION[*] BY
v.    Record No. 1157-99-1          JUDGE JAMES W. BENTON, JR.
                                         OCTOBER 10, 2000
COMMONWEALTH OF VIRGINIA


           FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                      Jerome B. Friedman, Judge

              Robert Wagner (Donald R. Lee, Jr.;
              Frederick R. Gerson; Wagner & Wagner;
              Virginia Law & Government Affairs, P.C., on
              briefs), for appellant.

              Eugene Murphy, Assistant Attorney General
              (Mark L. Earley, Attorney General, on brief),
              for appellee.


     A jury convicted David James Bunton of second degree

murder, robbery, and use of a firearm while committing a felony.

On this appeal, Bunton contends the trial judge erred by 1)

finding Bunton's inculpatory statement voluntary and 2) ruling

that when he made the statement he was not in custody and had

not clearly asserted his right to counsel.  For the reasons that

follow, we hold that the statement was made while Bunton was in

custody, and we reverse the convictions and remand for a new

trial.

_____

     * Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

I.

On November 7, 1995, City of Virginia Beach Police Detective Al Byrum spoke to Bunton briefly at his home because the detective suspected Bunton was implicated in the murder of Alfonzo Lamont Pablo. The detective knew from his investigation that Pablo and Bunton had spoken by phone immediately prior to Pablo's death. After the detective's initial conversation with Bunton, he secured search warrants for Bunton's residence and for samples of Bunton's hair and blood. The detective testified that Bunton was the only suspect in the case and that the police had Bunton under intermittent surveillance for two days.

When the detective returned to Bunton's residence the next day, he told Bunton he "needed to talk to him" about "an investigation . . . that [Bunton] could be of assistance on." He asked if Bunton would "mind just riding with me down to police headquarters . . . to [view] . . . some pictures." When Bunton asked the detective whether he was required to accompany him, the detective responded, "I'm just needing your assistance on an investigation." The detective testified that he did not tell Bunton what the investigation involved until they arrived at the police station and that Bunton did not ask him. There is no evidence that the detective told Bunton he was under arrest, put Bunton in handcuffs, or informed Bunton he was not required to accompany the detective to the police station. Although the detective knew Bunton's home would be searched after he and

-

Bunton left for police headquarters, he did not show Bunton the search warrants for his home and his person.

When they arrived at the police headquarters, the detective showed Bunton several photographs. After Bunton identified one photograph as Pablo, the detective began questioning him further about how he knew Pablo and when he had last seen Pablo. The detective assured Bunton that he was "not interested in narcotics transactions" and continued to ask him when and where he last saw Pablo. Bunton said that he met Pablo to buy drugs around "eleven thirty, twelve, quarter to twelve." The detective then asked Bunton if he knew that Pablo sometimes carried a gun and asked Bunton if he knew Pablo was dead. Bunton answered "no" to both questions.

The detective told Bunton that he did not believe that Bunton was "involved in this" and continued to ask him questions. He told Bunton that Pablo was armed the night he died, that he did not think Pablo's death was "caused by anybody except for [Pablo]," and that he knew Pablo "could be rather abusive." When the detective asked Bunton to take a polygraph, Bunton refused.

The detective told Bunton that he knew the drug transaction had taken place at a different location and at a later time. Bunton then admitted that it had taken place at a different location and that he had lied because he read in the paper that Pablo had been killed. The detective later asked Bunton if

-

Pablo had tried to pull a gun on him and said, "[i]t's because of the way we found him and the way his weapon was indicates that he was getting ready to do something else."  The detective then assured Bunton that, "if [Pablo] initiated something here, . . . and your only recourse was to respond back, then this is a very minimal situation."  Soon thereafter, Bunton asked if he could go to urinate.  In response, the detective said, "I'd rather sit here and talk to you, a minute, but I'll let you take one, let me ask you something."  After the detective spoke for some time, Bunton asked again if he could go to urinate.  The detective responded, "Will you talk to me about it?"  After the detective tried again to convince Bunton to tell him what happened, Bunton once more asked if he could go to urinate.  Approximately five minutes after Bunton's original request, the detective acquiesced when Bunton promised to tell him what happened upon his return.

Shortly after they returned to the room, Bunton said, "you make this sound like you're sure I did something now," and said "I need to, I guess I need to talk to an attorney."  The detective responded, "You're not under arrest."  Bunton said, "I know, but you're talking about, you're not under arrest you're saying, you're making it sound like I'm involved with his death. . . .  That's what you're making it sound like."  Bunton stated six times that he wanted to talk to an attorney.  Each time the detective told him you're not under arrest or said

-

something else to distract him.  Starting to leave, Bunton said,
"Well, . . . if I'm not under arrest, I mean, I'd like you to
give me a ride home."  When the detective continued to question
him, Bunton asked, "if I were to tell you something that you
wanted to hear, I mean, what happens then? . . .  Am I free to
walk out of here?"  The detective responded, "I don't understand
what you're saying."  When Bunton said affirmatively, "I'm going
to talk to a lawyer . . . let's go home," the detective gave
Bunton the search warrant to take his blood and said, "Here's
the search warrant on your, on your person.  I'll execute it."
The detective then left with Bunton.  Bunton had asked seven
times if he could go home.

     After the detective returned to the room with Bunton,
Bunton again asked, "Can I go home and talk to my parents."  The
detective responded, "David, you can sit here, . . . tell me
what happened and then you and I can get right in the car and
I'm going to drop you off right at your house."  The detective
told Bunton that he would not arrest him today if he would "tell
me what happened," but that if Bunton left everything would be
"off" and he would "go ahead and maximize it."  He also told
Bunton that he knew Bunton "didn't mean for this to come about"
and told Bunton "you can walk" if he would "just tell . . . what
happened."

     After spending four hours at police headquarters, Bunton
told Byrum that he shot Pablo in self-defense.  He said there

-

was a dispute between them concerning a previous transaction in which Pablo had given him some defective cocaine. When he tried to remedy the matter with Pablo, Pablo "said something, like I'll kill you and started reaching for a gun." Bunton said he shot Pablo with a sawed-off shotgun. After Bunton made these statements, the detective took him home. At no time during the interrogation did the detective advise Bunton of his Miranda rights. The police arrested Bunton several hours after the detective took Bunton home.

Bunton moved to suppress his statement and argued that his statement was involuntary and that his Miranda rights were violated. The trial judge denied the motion, ruling that when Bunton made his statement he was not in custody, his statement was voluntary, and he did not have to be informed of his Miranda rights. At trial, a jury convicted Bunton of second degree murder, robbery, and use of a firearm while committing a felony.

## II.

Bunton contends that when he confessed to the killing he was in custody and should have been advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). The trial judge found that in his "opinion . . . [Bunton] was not in custody at the time he made the statements that later ended up incriminating him."

The protections afforded by Miranda apply when a person is subjected to custodial interrogation. See Edwards v. Arizona,

-

451 U.S. 477, 486-87 (1981); Tipton v. Commonwealth, 18 Va. App. 832, 835, 447 S.E.2d 539, 540 (1994). The United States Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444.

In determining whether a person was "in custody" for purposes of Miranda, we must examine the circumstances of each case, with "the ultimate inquiry [being] simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." Ford v. Commonwealth, 28 Va. App. 249, 256, 503 S.E.2d 803, 806 (1998) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). In making this determination, we must view the circumstances from the perspective of "how a reasonable [person] in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). Thus, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994).

Ruling that the interrogation was noncustodial, the trial judge found persuasive that "the detective picked up the defendant and the defendant sat in the front seat of the car . . . [and that they] entered in the front and not through the

-

sally port as people who are arrested enter."  He also noted that during the interrogation the detective told Bunton he was not under arrest and was free to leave and that the interview room door was not completely closed.  The trial judge failed to assess, however, many of the circumstances which are crucial to determining whether a suspect is in custody.  Among the factors that should be considered are "whether a suspect is questioned in familiar or neutral surroundings, the number of police officers present, the degree of physical restraint, . . . the duration and character of the interrogation, [w]hether or when probable cause to arrest exists[,] . . . when the suspect becomes the focus of the investigation[,] '[t]he language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention and the degree of pressure applied to detain the individual.'" Wass v. Commonwealth, 5 Va. App. 27, 32-33, 359 S.E.2d 836, 839 (1987) (citations omitted).

The record establishes that Bunton did not have any extensive experience with the criminal justice system; it establishes that he had only two previous charges for driving under the influence.  His lack of experience with the criminal justice system is significant because when the detective asked Bunton if he would "mind just riding . . . down to police headquarters," Bunton asked whether he was required to accompany

-

the detective. Significantly, the detective did not tell him he could refuse. Instead, he said "I'm just needing your assistance on an investigation." At that time, Bunton was a suspect in the murder. The detective had already obtained warrants to search Bunton's home and his person. The detective did not tell Bunton, however, that he was not under arrest. Indeed, the detective did not tell Bunton that he was not under arrest until Bunton made his first request for counsel, more than two hours after the interrogation began.

Although the detective told Bunton two hours into the interrogation that he was free to leave, this Court has held "that informing a suspect that he is not in custody and is free to leave does not necessarily mean that he is not in custody." Id. at 33-34, 359 S.E.2d at 840. Moreover, Bunton obviously thought he had to have the detective's permission even to go to the bathroom. The detective's conduct reinforced that belief because Bunton asked three times before the detective relented. Indeed, although Bunton asked the detective to let him go home at least seven times before he confessed, the detective did not agree to do so until after Bunton confessed. In addition, Bunton reasonably could have believed he could not leave without the detective's cooperation because the detective drove him to the police station.

Other evidence also proves that when the detective interrogated Bunton at the police station, the circumstances

-

effectively rendered the interrogation custodial.  The interrogation occurred in a small, closed room in the police station.  By virtue of the detective's insistence that Bunton stay and answer questions and Bunton's lack of experience of this nature with the police, Bunton had no basis upon which to conclude that he had not been deprived of his freedom to leave. Bunton asked the detective for permission to go to the bathroom and repeatedly asked the detective to take him home, without success.  At key points in the interrogation, the detective moved his chair closer to Bunton, confining Bunton to a corner of the room.  He repeatedly lied to Bunton during the course of the interrogation.  Moreover, each of the six times Bunton said he wanted a lawyer, the detective tried to distract him by telling him he was not under arrest or by asking Bunton another question.  The detective also threatened Bunton that if he stopped talking to him and called a lawyer, the authorities would have to "maximize the situation."

We hold that these circumstances objectively conveyed to Bunton that he had been "deprive[d] . . . of his freedom to leave or freedom of action [, which] render[ed] him in custody for purposes of Miranda."  Wass, 5 Va. App. at 32, 359 S.E.2d at 839.  Because Bunton confessed after questioning by the police, while he was deprived of his freedom of action in a significant way and before he had been given Miranda warnings, his confession should have been suppressed, see Wass, 5 Va. App. at

-

35, 359 S.E.2d at 840, and should not have been admitted in evidence.  See Dean v. Commonwealth, 209 Va. 666, 667-68, 166 S.E.2d 228, 230 (1969).

For these reasons, we hold that the trial judge erred in refusing to suppress the statement.  Because the statement must be suppressed, we need not address whether it was voluntary.  Accordingly, we reverse Bunton's convictions and remand for a new trial.

Reversed and remanded.