## STANSBURY *v.* CALIFORNIA

No. 93–5770.   Argued March 30, 1994—Decided April 26, 1994

*Robert M. Westberg,* by appointment of the Court, 510 U. S. 1009, argued the cause for petitioner.   With him on the briefs were *David S. Winton* and *Joseph A. Hearst.*

*Aileen Bunney,* Deputy Attorney General of California, argued the cause for respondent. With her on the brief were *Daniel E. Lungren,* Attorney General, *George Williamson,* Chief Assistant Attorney General, *Ronald A. Bass,* Senior Assistant Attorney General, and *Ronald E. Niver,* Deputy Attorney General.*

PER CURIAM.

This case concerns the rules for determining whether a person being questioned by law enforcement officers is held in custody, and thus entitled to the warnings required by *Miranda* v. *Arizona,* 384 U. S. 436 (1966). We hold, not for the first time, that an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody.

I

Ten-year-old Robyn Jackson disappeared from a playground in Baldwin Park, California, at around 6:30 p.m. on September 28, 1982. Early the next morning, about 10 miles away in Pasadena, Andrew Zimmerman observed a large man emerge from a turquoise American sedan and throw something into a nearby flood control channel. Zimmerman called the police, who arrived at the scene and discovered the girl's body in the channel. There was evidence that she had been raped, and the cause of death was determined to be asphyxia complicated by blunt force trauma to the head.

Lieutenant Thomas Johnston, a detective with the Los Angeles County Sheriff's Department, investigated the hom-

---

*Briefs of *amici curiae* urging affirmance were filed for the Orange County District Attorney, State of California, by *Michael R. Capizzi* and *Devallis Rutledge;* for Americans for Effective Law Enforcement, Inc., by *Bernard J. Farber, Fred E. Inbau, Wayne W. Schmidt,* and *James P. Manak;* and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger.*

icide. From witnesses interviewed on the day the body was discovered, he learned that Robyn had talked to two ice cream truck drivers, one being petitioner Robert Edward Stansbury, in the hours before her disappearance. Given these contacts, Johnston thought Stansbury and the other driver might have some connection with the homicide or knowledge thereof, but for reasons unimportant here Johnston considered only the other driver to be a leading suspect. After the suspect driver was brought in for interrogation, Johnston asked Officer Lee of the Baldwin Park Police Department to contact Stansbury to see if he would come in for questioning as a potential witness.

Lee and three other plainclothes officers arrived at Stansbury's trailer home at about 11:00 that evening. The officers surrounded the door and Lee knocked. When Stansbury answered, Lee told him the officers were investigating a homicide to which Stansbury was a possible witness and asked if he would accompany them to the police station to answer some questions. Stansbury agreed to the interview and accepted a ride to the station in the front seat of Lee's police car.

At the station, Lieutenant Johnston, in the presence of another officer, questioned Stansbury about his whereabouts and activities during the afternoon and evening of September 28. Neither Johnston nor the other officer issued *Miranda* warnings. Stansbury told the officers (among other things) that on the evening of the 28th he spoke with the victim at about 6:00, returned to his trailer home after work at 9:00, and left the trailer at about midnight in his housemate's turquoise, American-made car. This last detail aroused Johnston's suspicions, as the turquoise car matched the description of the one Andrew Zimmerman had observed in Pasadena. When Stansbury, in response to a further question, admitted to prior convictions for rape, kidnaping, and child molestation, Johnston terminated the interview and another officer advised Stansbury of his *Miranda* rights.

Stansbury declined to make further statements, requested an attorney, and was arrested. Respondent State of California charged Stansbury with first-degree murder and other crimes.

Stansbury filed a pretrial motion to suppress all statements made at the station, and the evidence discovered as a result of those statements. The trial court denied the motion in relevant part, ruling that Stansbury was not "in custody"—and thus not entitled to *Miranda* warnings—until he mentioned that he had taken his housemate's turquoise car for a midnight drive. Before that stage of the interview, the trial court reasoned, "the focus in [Lieutenant Johnston's] mind certainly was on the other ice cream [truck] driver," Tr. 2368; only "after Mr. Stansbury made the comment . . . describing the . . . turquoise-colored automobile" did Johnston's suspicions "shif[t] to Mr. Stansbury," *ibid.* Based upon its conclusion that Stansbury was not in custody until Johnston's suspicions had focused on him, the trial court permitted the prosecution to introduce in its case in chief the statements Stansbury made before that time. At trial, the jury convicted Stansbury of first-degree murder, rape, kidnaping, and lewd act on a child under the age of 14, and fixed the penalty for the first-degree murder at death.

The California Supreme Court affirmed. Before determining whether Stansbury was in custody during the interview at the station, the court set out what it viewed as the applicable legal standard:

> "In deciding the custody issue, the totality of the circumstances is relevant, and no one factor is dispositive. However, the most important considerations include (1) the site of the interrogation, (2) whether the investigation has focused on the subject, (3) whether the objective indicia of arrest are present, and (4) the length and form of questioning." 4 Cal. 4th 1017, 1050, 846 P. 2d 756, 775 (1993) (internal quotation marks omitted).

The court proceeded to analyze the second factor in detail, in the end accepting the trial court's factual determination "that suspicion focused on [Stansbury] only when he mentioned that he had driven a turquoise car on the night of the crime." *Id.*, at 1052, 846 P. 2d, at 776. The court "conclude[d] that [Stansbury] was not subject to custodial interrogation before he mentioned the turquoise car," and thus approved the trial court's ruling that *Miranda* v. *Arizona* did not bar the admission of statements Stansbury made before that point. 4 Cal. 4th, at 1054, 846 P. 2d, at 777–778.

We granted certiorari. 510 U. S. 943 (1993).

## II

We held in *Miranda* that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U. S., at 444. Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial. Compare *id.*, at 492, 494, with *Harris* v. *New York*, 401 U. S. 222 (1971). An officer's obligation to administer *Miranda* warnings attaches, however, "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon* v. *Mathiason*, 429 U. S. 492, 495 (1977) *(per curiam);* see also *Illinois* v. *Perkins*, 496 U. S. 292, 296 (1990). In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California* v. *Beheler*, 463 U. S. 1121, 1125 (1983) *(per curiam)* (quoting *Mathiason, supra*, at 495).

Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. In *Beckwith* v. *United States*, 425 U. S. 341 (1976), for example, the defendant, without being advised of his *Miranda* rights, made incriminating statements to Government agents during an interview in a private home. He later asked that *Miranda* "be extended to cover interrogation in noncustodial circumstances after a police investigation has focused on the suspect." 425 U. S., at 345 (internal quotation marks omitted). We found his argument unpersuasive, explaining that it "was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial questioning." *Id.,* at 346–347 (internal quotation marks omitted). As a result, we concluded that the defendant was not entitled to *Miranda* warnings: "Although the 'focus' of an investigation may indeed have been on Beckwith at the time of the interview . . . , he hardly found himself in the custodial situation described by the *Miranda* Court as the basis for its holding." 425 U. S., at 347.

*Berkemer* v. *McCarty*, 468 U. S. 420 (1984), reaffirmed the conclusions reached in *Beckwith*. *Berkemer* concerned the roadside questioning of a motorist detained in a traffic stop. We decided that the motorist was not in custody for purposes of *Miranda* even though the traffic officer "apparently decided as soon as [the motorist] stepped out of his car that [the motorist] would be taken into custody and charged with a traffic offense." 468 U. S., at 442. The reason, we explained, was that the officer "never communicated his intention to" the motorist during the relevant questioning. *Ibid.* The lack of communication was crucial, for under *Miranda* "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular

time"; rather, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." 468 U. S., at 442. Other cases of ours have been consistent in adhering to this understanding of the custody element of *Miranda.* See, *e. g., Mathiason, supra,* at 495 ("Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody'"); *Beheler, supra,* at 1124, n. 2 ("Our holding in *Mathiason* reflected our earlier decision in *[Beckwith],* in which we rejected the notion that the 'in custody' requirement was satisfied merely because the police interviewed a person who was the 'focus' of a criminal investigation"); *Minnesota* v. *Murphy,* 465 U. S. 420, 431 (1984) ("The mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings, and the probation officer's knowledge and intent have no bearing on the outcome of this case") (citation omitted); cf. *Pennsylvania* v. *Bruder,* 488 U. S. 9, 11, n. 2 (1988).

It is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda.* See F. Inbau, J. Reid, & J. Buckley, Criminal Interrogation and Confessions 232, 236, 297–298 (3d ed. 1986). The same principle obtains if an officer's undisclosed assessment is that the person being questioned is not a suspect. In either instance, one cannot expect the person under interrogation to probe the officer's innermost thoughts. Save as they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the *Miranda* custody inquiry. "The threat to a citizen's Fifth Amendment rights

that *Miranda* was designed to neutralize has little to do with the strength of an interrogating officer's suspicions." *Berkemer, supra,* at 435, n. 22.

An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Cf. *Michigan* v. *Chesternut,* 486 U. S. 567, 575, n. 7 (1988) (citing *United States* v. *Mendenhall,* 446 U. S. 544, 554, n. 6 (1980) (opinion of Stewart, J.)). Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her "'freedom of action.'" *Berkemer, supra,* at 440. Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case. In sum, an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave. (Of course, instances may arise in which the officer's undisclosed views are relevant in testing the credibility of his or her account of what happened during an interrogation; but it is the objective surroundings, and not any undisclosed views, that control the *Miranda* custody inquiry.)

We decide on this state of the record that the California Supreme Court's analysis of whether Stansbury was in custody is not consistent in all respects with the foregoing principles. Numerous statements in the court's opinion are open

to the interpretation that the court regarded the officers' subjective beliefs regarding Stansbury's status as a suspect (or nonsuspect) as significant in and of themselves, rather than as relevant only to the extent they influenced the objective conditions surrounding his interrogation. See 4 Cal. 4th, at 1050, 846 P. 2d, at 775 ("whether the investigation ha[d] focused on the" person being questioned is among the "most important considerations" in assessing whether the person was in custody). So understood, the court's analysis conflicts with our precedents. The court's apparent conclusion that Stansbury's *Miranda* rights were triggered by virtue of the fact that he had become the focus of the officers' suspicions, see 4 Cal. 4th, at 1052, 1054, 846 P. 2d, at 776, 777–778; cf., *e. g., State* v. *Blanding*, 69 Haw. 583, 586–587, 752 P. 2d 99, 101 (1988); *State* v. *Hartman*, 703 S. W. 2d 106, 120 (Tenn. 1985), cert. denied, 478 U. S. 1010 (1986); *People* v. *Herdon*, 42 Cal. App. 3d 300, 307, n. 10, 116 Cal. Rptr. 641, 645, n. 10 (1974), is incorrect as well. Our cases make clear, in no uncertain terms, that any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda*. See generally 1 W. LaFave & J. Israel, Criminal Procedure §6.6(a), pp. 489–490 (1984).

The State acknowledges that Lieutenant Johnston's and the other officers' subjective and undisclosed suspicions (or lack thereof) do not bear upon the question whether Stansbury was in custody, for purposes of *Miranda*, during the station house interview. It maintains, however, that the objective facts in the record support a finding that Stansbury was not in custody until his arrest. Stansbury, by contrast, asserts that the objective circumstances show that he was in custody during the entire interrogation. We think it appropriate for the California Supreme Court to consider this question in the first instance. We therefore reverse its

judgment and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, concurring.

I join the Court's *per curiam* opinion and merely add that, even if I were not persuaded that the judgment must be reversed for the reasons stated in that opinion, I would adhere to my view that the death penalty cannot be imposed fairly within the constraints of our Constitution. See my dissent in *Callins* v. *Collins*, 510 U. S. 1141, 1143 (1994). I therefore would vacate the death sentence on that ground, too.