STATE OF NORTH CAROLINA v. RODNEY DALE BUCHANAN

No. 190A00

(Filed 6 April 2001)

**Confessions and Incriminating Statements— Miranda warnings—test for custody**

A ruling by the trial court suppressing a first-degree murder defendant's statement was remanded where the trial court mistakenly applied the "free to leave" test in determining whether defendant was in custody for purposes of Miranda. The appropriate inquiry is whether, based on the totality of the circumstances, there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. The broader "free to leave" test and "restraint on freedom of movement of the degree associated with formal arrest" are not synonymous; circumstances supporting an objective showing that one is "in custody" might include a police officer standing guard at the door, locked doors, or handcuffs. Moreover, the subjective unspoken intent of a law enforcement officer, provided it is not communicated or manifested to the defendant in any way, and the subjective interpretation of a defendant are not relevant to the objective determination of whether the totality of the circumstances support the conclusion that defendant was in custody.

Appeal pursuant to N.C.G.S. § 15A-979(c) from an order allowing suppression of defendant's statement entered in a first-degree murder case by Beal, J., on 14 February 2000, *nunc pro tunc* 7 February 2000, in Superior Court, Gaston County. Heard in the Supreme Court 17 October 2000.

*Michael F. Easley, Attorney General, by William P. Hart, Special Deputy Attorney General, for the State-appellant.*

*Richard B. Schultz and Edgar F. Bogle for defendant-appellee.*

**STATE v. BUCHANAN**

[353 N.C. 332 (2001)]

LAKE, Chief Justice.

Defendant was arrested on 2 July 1997 by Gaston County police for the 24 June 1997 murders of Ronald Hoyle and Maria Pressley and was subsequently indicted on 4 August 1997 for two counts of first-degree murder. On 31 January 2000, defendant filed a motion to suppress his pretrial statements to detectives based on the assertions that defendant was "in custody" at the time the statements were given, defendant was not advised of his constitutional rights until after he had made incriminating statements, and defendant's mental and physical faculties were impaired at the time the statements were given. The motion to suppress was heard by Judge Beverly T. Beal on 7 February 2000, and following an evidentiary hearing, the trial court made extensive findings of fact and reached conclusions of law in open court and granted defendant's motion to suppress. On 14 February 2000, *nunc pro tunc* 7 February 2000, the trial court entered a written order to that effect. The State filed written notice of appeal on 14 February 2000.

Evidence presented at the suppression hearing showed that on 2 July 1997, at approximately 1:30 p.m., Sergeant Dean Henderson of the Gaston County Police Department was dispatched to the construction site of a church where defendant was working on the roof. When informed that Sergeant Henderson was there to see him, defendant climbed down a ladder to speak to the sergeant. The two had spoken a few days earlier about the homicides of Maria Pressley and Ronald Hoyle, and on 2 July, the sergeant informed defendant that new information had been received and that officers needed to speak with defendant at the police station. Apparently, police had found some inconsistencies in statements regarding defendant's whereabouts on the night of the murders.

Sergeant Henderson was in plain clothes and was driving an unmarked car. He asked defendant if he would come to the police station to answer some questions, and defendant agreed. Sergeant Henderson gave defendant the option of taking defendant's own vehicle to the station or riding with him, and defendant chose to ride with Sergeant Henderson. The sergeant told defendant that he was not under arrest and that he was free to leave at any time. Defendant was not handcuffed or searched and rode in the front passenger seat of the vehicle.

At the police station, Sergeant Henderson parked in back of the building in a lot where officers park, and he and defendant entered a

back door of the building and went through the break room and up one flight of stairs to the second floor. Defendant asked to use the rest room, and after receiving directions from Sergeant Henderson, defendant went to the rest room and to get a drink of water by himself. The two then went to Captain Farley's office, which was approximately twelve feet by twelve feet and had a desk, some computer equipment, a telephone, some chairs and one window. Sergeant Henderson left defendant alone in the office and went to get Sergeants Osborne and Myers, who came into the office a few minutes later. Both sergeants were dressed in shirt and tie; Sergeant Osborne was wearing a firearm, and Sergeant Myers was unarmed. Sergeant Osborne sat at the desk to take notes, defendant sat in a chair in front of the desk, and Sergeant Myers sat in another chair next to defendant. Sergeant Myers conducted the interview, which started at approximately 2:00 p.m., half an hour after defendant was picked up at his work site.

At the beginning of the interview, Sergeant Myers told defendant that he was not under arrest and that he was free to leave at any time. He also asked defendant if he wanted anything to eat or drink and engaged in conversation to establish rapport. The sergeant eventually told defendant that they had spoken to Vaughn Trammel, who lived near the clubhouse where the victims had been killed; that they had talked about defendant's whereabouts at the time of the homicides; and that Trammel had said that defendant told him not to tell the police that defendant was at Trammel's house the night of the murders. In response to the sergeant's request for an explanation, defendant admitted to being at the clubhouse the night of the murders.

After further questioning, defendant gave an oral statement, between 2:00 p.m. and 3:23 p.m., stating that he went to the clubhouse that night, that Hoyle was upset with him because defendant was drunk and that a confrontation ensued between defendant and Hoyle in the living room. Defendant stated that he "just went berserk," that he went behind the bar where the shotgun rack was and that he took a gun off the wall and started shooting at Hoyle and Pressley.

Sergeant Myers estimated that defendant gave the verbal statement about forty-five minutes into the interview and that Sergeant Osborne started writing the statement at 3:23 p.m. Shortly thereafter, defendant asked to use the rest room, and defendant and both officers went to the rest room, with Sergeant Osborne entering first, defendant following, and Sergeant Myers entering last. Sergeant

Osborne was the first one out of the rest room, and he and defendant were standing in the hallway when Sergeant Myers came out. Upon returning to the office, defendant was again told he was not under arrest and was free to leave.

After the written statement was prepared, the officers gave it to defendant for him to read and sign. Defendant signed the statement at 4:36 p.m. After defendant signed the statement, the officers asked him for further clarification based on the fact that the victims had been shot in their bedroom at the clubhouse, and this was inconsistent with defendant's statement that the shooting had occurred in the living room. Defendant then admitted that after the fight was over, Hoyle and Pressley went downstairs to the bedroom, and because defendant felt that Hoyle was going to get his shotgun, defendant went to the bedroom and shot them. Defendant's change to his statement was reduced to writing and signed by defendant at 5:46 p.m. Defendant had not yet been advised of his *Miranda* rights.

After defendant's second statement was signed, he was arrested and charged, he was given *Miranda* warnings, the officers filled in the *Miranda* form, and defendant signed the form waiving his constitutional rights at 5:57 p.m. The next day, at 11:00 a.m., while in custody, the officers again advised defendant of his *Miranda* rights, and those rights were invoked.

During the evidentiary hearing on the motion to suppress, Sergeant Osborne stated that about halfway through the interview the secretary's phone rang, and because the secretary was talking on the phone, the sergeant closed the office door where the interview was being conducted. The door remained closed, but unlocked, for the rest of the interview.

Both sergeants also stated that, other than one request for a bathroom break, defendant never asked for anything to eat or drink, to make a telephone call, to take a break or to leave. Defendant was never patted down or handcuffed, and the seating arrangement of the three did not change. The sergeants stated that they did not notice any odor of alcohol; impairment in defendant's speech; bloodshot, glassy, or watery eyes; or any signs that defendant was under the influence of any impairing substance.

On appeal, the State contends the trial court applied an incomplete test in determining whether defendant was "in custody" for the purposes of *Miranda* and, therefore, erred in granting defendant's

motion to suppress. Specifically, the State contends that in reaching its decision to suppress defendant's statement, the trial court's inquiry was based on the incorrect standard of whether a reasonable person in defendant's position, under the totality of the circumstances, would have felt "free to leave," rather than whether a reasonable person would have perceived that there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." We agree that the trial court applied the incorrect test in determining whether defendant was "in custody" for the purposes of *Miranda*, and we remand to the trial court for reconsideration and application of the appropriate test.

It is well established that the standard of review in evaluating a trial court's ruling on a motion to suppress is that the trial court's findings of fact " 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.' " *State v. Brewington*, 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000) (quoting *State v. Eason*, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994), *cert. denied*, 513 U.S. 1096, 130 L. Ed. 2d 661 (1995)), *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 992 (2001). Additionally, the trial court's determination of whether an interrogation is conducted while a person is in custody involves reaching a conclusion of law, which is fully reviewable on appeal. *State v. Greene*, 332 N.C. 565, 577, 422 S.E.2d 730, 737 (1992). " '[T]he trial court's conclusions of law must be legally correct, reflecting a correct application of applicable legal principles to the facts found.' " *State v. Golphin*, 352 N.C. 364, 409, 533 S.E.2d 168, 201 (2000) (quoting *State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997)), *cert. denied*, —— U.S. ——, 149 L. Ed. 2d 305 (2001). In the instant case, the trial court's conclusions of law reflect an incorrect application of legal principles to the facts found.

In considering the appropriate test for determining whether a defendant is "in custody" for purposes of *Miranda*, it is instructive to briefly review the history of *Miranda*. The warning was conceived to protect an individual's Fifth Amendment right against self-incrimination in the inherently compelling context of custodial interrogations by police officers. *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). Although the United States Supreme Court has acknowledged that the Fifth Amendment prohibits the use only of "compelled" testimony, it has interpreted the *Miranda* decision as holding that failure to administer *Miranda* warnings in "custodial situations" creates a presumption of compulsion which would exclude statements of a

defendant. *Oregon v. Elstad,* 470 U.S. 298, 306-07, 84 L. Ed. 2d 222, 230-31 (1985). Therefore, the initial inquiry in determining whether *Miranda* warnings were required is whether an individual was "in custody."

In *Miranda,* the Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any *significant* way." *Miranda,* 384 U.S. at 444, 16 L. Ed. 2d at 706 (emphasis added). In subsequent years, the Court has explained and refined what it meant by that language. In *Oregon v. Mathiason,* the Supreme Court reviewed the Oregon Supreme Court's conclusion that, although the defendant went to the police station voluntarily and was told he was not under arrest, the defendant was in custody because the parties were at the police station and were alone behind closed doors, the officer had informed the defendant that he was a suspect, the defendant was falsely told that the officers had evidence incriminating him in the crime, and the questioning took place in a "coercive environment." *Oregon v. Mathiason,* 429 U.S. 492, 50 L. Ed. 2d 714 (1977). The Supreme Court reversed the Oregon court, stating:

> [A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.

*Id.* at 495, 50 L. Ed. 2d at 719.

Six years later, in *California v. Beheler,* the United States Supreme Court reviewed a California Court of Appeals' decision in

which that court found "custody" where the interview took place in the station house, the police had already identified Beheler as a suspect and the design of the interview was to produce incriminating responses. In reversing the California court, the Supreme Court concluded that the court improperly focused on the fact that Beheler was a suspect and was questioned at the station house and held that, "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 1279 (1983) (quoting *Mathiason*, 429 U.S. at 495, 50 L. Ed. 2d at 719).

Since *Beheler*, the Supreme Court has consistently held that the "ultimate inquiry," based on the totality of circumstances, in determining whether an individual is "in custody" is whether there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *See Thompson v. Keohane*, 516 U.S. 99, 112, 133 L. Ed. 2d 383, 394 (1995) (stating that the court must apply an objective test to resolve the "ultimate inquiry"); *Stansbury v. California*, 511 U.S. 318, 322, 128 L. Ed. 2d 293, 298 (1994) (stating the "ultimate inquiry" is whether there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest"); *Berkemer v. McCarty*, 468 U.S. 420, 440, 82 L. Ed. 2d 317, 335 (1984) (stating that it is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's "freedom of action is curtailed to a degree associated with formal arrest").

The Supreme Court of North Carolina summarized the law regarding the application of *Miranda* in custodial interrogations in *State v. Gaines* and recognized that "in determining whether a suspect [is] in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *State v. Gaines*, 345 N.C. 647, 662, 483 S.E.2d 396, 405, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997); *see also Brewington*, 352 N.C. at 499, 532 S.E.2d at 502 (definitive inquiry is whether there was a "formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest"); *State v. McNeill*, 349 N.C. 634, 644, 509 S.E.2d 415, 421 (1998) (definitive inquiry is whether there was a "formal arrest or

**STATE v. BUCHANAN**

[353 N.C. 332 (2001)]

a restraint on freedom of movement of the degree associated with a formal arrest"), *cert. denied*, 528 U.S. 838, 145 L. Ed. 2d 87 (1999); *State v. Gregory*, 348 N.C. 203, 207-08, 499 S.E.2d 753, 757 (definitive inquiry is whether there was a "formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest"), *cert. denied*, 525 U.S. 952, 142 L. Ed. 2d 315 (1998); *State v. Daughtry*, 340 N.C. 488, 506-07, 459 S.E.2d 747, 755 (1995) ("ultimate inquiry" is whether there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest"), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996). Therefore, based on United States Supreme Court precedent and the precedent of this Court, the appropriate inquiry in determining whether a defendant is "in custody" for purposes of *Miranda* is, based on the totality of the circumstances, whether there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."

Defendant contends that the concept of "restraint on freedom of movement of the degree associated with a formal arrest" merely clarifies what is meant by a determination of whether a suspect was "free to leave." The two standards are not synonymous, however, as is evidenced by the fact that the "free to leave" test has long been used for determining, under the Fourth Amendment, whether a person has been seized. *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509 (1980). Conversely, the indicia of formal arrest test has been consistently applied to Fifth Amendment custodial inquiries and requires circumstances which go beyond those supporting a finding of temporary seizure and create an objectively reasonable belief that one is actually or ostensibly "in custody." *See Gaines*, 345 N.C. at 662-63, 483 S.E.2d at 405-06 (applying the "free to leave" test in Fourth Amendment analysis and the "restraint on freedom of movement to the degree of a formal arrest" test to Fifth Amendment analysis); *see also United States v. Sullivan*, 138 F.3d 126, 130 (4th Cir. 1998) (differentiating between being "free to leave" and having "freedom of action curtailed to a degree associated with arrest"). Circumstances supporting an objective showing that one is "in custody" might include a police officer standing guard at the door, locked doors or application of handcuffs.

The trial court in the instant case mistakenly applied the broader "free to leave" test in determining whether defendant was "in custody" for the purposes of *Miranda*. We therefore remand the case to the trial court for a redetermination of whether a reasonable person in defendant's position, under the totality of the circumstances,

would have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest.

The State contends this Court has been inconsistent in its application of the "ultimate inquiry" test versus the "free to leave" test. *See State v. Jackson*, 348 N.C. 52, 55, 497 S.E.2d 409, 411 (applying the "free to leave" test to determine custody), *cert. denied*, 525 U.S. 943, 142 L. Ed. 2d 301 (1998); *State v. Rose*, 335 N.C. 301, 334, 439 S.E.2d 518, 536 (applying the "free to leave" test to determine custody), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994); *State v. Hicks*, 333 N.C. 467, 478, 428 S.E.2d 167, 173 (1993) (applying the "free to leave" test to determine custody); *State v. Smith*, 317 N.C. 100, 104, 343 S.E.2d 518, 520 (1986) (holding that the operative question was whether a reasonable person would believe he was "free to leave"). To the extent that these or other opinions of this Court or the Court of Appeals have stated or implied that the determination of whether a defendant is "in custody" for *Miranda* purposes is based on a standard other than the "ultimate inquiry" of whether there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," that language is disavowed. *See McNeill*, 349 N.C. at 644, 509 S.E.2d at 421 (definitive inquiry is whether there was a "formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest"); *Gregory*, 348 N.C. at 207-08, 499 S.E.2d at 757 (definitive inquiry is whether there was a "formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest"); *Gaines*, 345 N.C. at 662, 483 S.E.2d at 405 (definitive inquiry is whether there was a "formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest"); *Daughtry*, 340 N.C. at 506-07, 459 S.E.2d at 755 (ultimate inquiry is whether there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest").

In reviewing the trial court's findings of fact in the instant case, we note several findings which reference the fact that although Sergeant Myers told defendant he was not under arrest and was free to leave, the sergeant subjectively did not intend to let defendant leave the station after defendant verbally confessed to shooting the victims. The trial court's findings also indicate that the reason the officers did not read defendant his *Miranda* warnings was because they did not want defendant to invoke his rights and because the interrogation by the officers was intended to elicit an incriminating response from defendant. Specifically, the trial court found:

10. The Defendant and both officers went to the restroom and upon returning, the Defendant was told again that he was not under arrest and was free to leave. This was not true. The Defendant was not free to leave. The officers would not have allowed him to leave at that time.

. . . .

15. The Defendant was not free to leave the Gaston County Police Department after his arrival there. He was deceived in regard to his ability to freely leave.

16. The Defendant has an eight [sic] grade education. The interrogation by the officers was intended to, and was reasonably likely to, elicit an incriminating response from the Defendant.

17. It was the officer's testimony that the reason why he did not read the Defendant his Miranda warnings was because he did not want the Defendant to invoke his rights.

Based on the aforementioned and other findings of fact, the trial court concluded as a matter of law "that a reasonable person would, considering the totality of the circumstances, not have felt free to leave" and that "[t]he statements obtained from the Defendant were the result of custodial interrogation." Although it is not clear to what extent the trial court, in reaching its conclusions of law, considered as significant the officer's unspoken intention not to let defendant leave the station after his verbal confession and the officer's intention to elicit incriminating responses from defendant, we determine that the law should be clarified in this regard.

Throughout the years, the United States Supreme Court has stressed that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323, 128 L. Ed. 2d at 298. Unless "they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the *Miranda* custody inquiry." *Id.* at 324, 128 L. Ed. 2d at 300. Nor can an officer's knowledge or beliefs bear upon the custody issue unless they are conveyed, by word or deed, to the individual being questioned. *Id.* at 325, 128 L. Ed. 2d at 300. "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only rele-

vant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442, 82 L. Ed. 2d at 336.

In the instant case, the fact that Sergeant Myers had decided at some point during the interview that he was not going to allow defendant to leave and was going to arrest defendant at the end of the interview is irrelevant to the custody inquiry, unless those intentions were somehow manifested to defendant. The subjective unspoken intent of a law enforcement officer, provided it is not communicated or manifested to the defendant in any way, and subjective interpretation of a defendant are not relevant to the objective determination of whether the totality of the circumstances support the conclusion that defendant was "in custody."

As to the officer's intent to elicit incriminating responses from defendant, the objective of *Miranda* is to protect against coerced confessions, not to suppress voluntary confessions, which "are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Moran v. Burbine*, 475 U.S. 412, 426, 89 L. Ed. 2d 410, 424 (1986). "Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Colorado v. Connelly*, 479 U.S. 157, 170, 93 L. Ed. 2d 473, 486 (1986) (quoting *Elstad*, 470 U.S. at 305, 84 L. Ed. 2d at 229). Therefore, in the instant case, the fact that Sergeant Myers intended to elicit incriminating responses from defendant through means other than coercion is irrelevant to the determination of whether defendant was "in custody."

On remand, the trial court should consider Sergeant Myers' intention not to allow defendant to leave the station and his attempts to elicit incriminating responses as relevant only to the extent that those intentions were manifested to defendant in some way that would contribute to an objective determination that defendant's freedom of movement was restrained to the degree associated with a formal arrest. In reaching its determination, the trial court may, but is not required to, take additional evidence. We express no view on the ultimate disposition of defendant's motion to suppress because this necessarily involves fact-specific assessments and inquiries which the trial court is in the best position to make.

REMANDED.

PIEDMONT TRIAD REG'L WATER AUTH. v. SUMNER HILLS, INC.

[353 N.C. 343 (2001)]

Justices EDMUNDS and BUTTERFIELD did not participate in the consideration or decision of this case.