STATE OF NORTH CAROLINA
v.
AKEEM RASHADD KEATON.
No. COA08-840.
Court of Appeals of North Carolina.
Filed May 19, 2009.
This case not for publication
Attorney General Roy A. Cooper, III, by Assistant Attorney General Daniel P. O'Brien, for the State.
Appellate Defender Staples Hughes, by Assistant Appellate Defender Charlesena Elliott Walker, for defendant-appellant.
JACKSON, Judge.
Akeem Rashadd Keaton ("defendant") appeals his convictions for first-degree murder, first-degree kidnapping, and robbery with a dangerous weapon. For the reasons stated below, we hold no prejudicial error.
On 28 January 2005, defendant spent the evening with his cousin, Kurt Brock ("Brock"), and Harmahn Smith ("Smith") at Brock's apartment, where they watched a movie until defendant fell asleep with Smith at the other end of the same couch. Brock was almost twenty-one years old; defendant had just turned sixteen.
Defendant was awakened by Smith's screams as Brock stabbed Smith repeatedly with a lock-blade knife. Defendant stood back andwatched, unable to say or do anything. When the knife broke, Brock grabbed a frying pan from a nearby table and began hitting Smith in the head with it. When the pan's handle broke, either Brock told defendant to go get knives from the kitchen, threatening to kill him if he did not, or defendant took it upon himself to get knives from the kitchen. Defendant admitted cutting Smith at least once.
Later, Brock duct taped Smith's hands behind his back and enlisted defendant's help in holding Smith's legs while he taped them together. Brock took Smith's chain, wallet, and cell phone. He taped a towel over Smith's face. After removing everything from Smith's wallet, Brock placed the money in his pocket, and placed the identification cards and empty wallet on the table. He then left the apartment for approximately forty-five minutes to "throw away some evidence." Smith was still alive when Brock left and talked to defendant while Brock was gone.
When Brock returned, he had black garbage bags with him, which he duct taped around Smith's body, including over his head. Brock then left again for another period of approximately forty-five minutes to dispose of the garbage bags. Smith was still alive, and at some point asked defendant for a pillow, which defendant provided. Eventually, defendant could no longer hear Smith breathing.
Approximately thirty minutes after Brock's return, he said that they needed to get Smith out of the house. Brock and defendant carried Smith out of the apartment, down the steps, and placed him in the trunk of Smith's own car, to which Brock had thekeys. Brock and defendant drove to a lake where Brock said they would dispose of the body.
According to defendant, Smith did not speak or move when they opened the trunk and the bag over his head was still intact. He and Brock carried Smith down to the lake and Brock instructed him to take off his pants and shoes. Brock then told defendant to push Smith out into the water or "he would kill me, too." Defendant took the body approximately ten feet from the bank with nothing to make the body submerge.
However, Brock testified that Smith was still alive when they took him out of the trunk and the bag over his head had come off. Defendant took Smith into the water and held his head under for approximately thirty or forty seconds until Smith stopped kicking. Defendant then pushed Smith's body under the water and left.
Smith's body was recovered on 27 February 2005. His decomposing body was identified by dental and medical records. The autopsy revealed that Smith died of multiple stab wounds and asphyxia. The asphyxia was caused by the bag over Smith's head. Smith could have recovered from his multiple knife wounds had he been given medical attention.
Police questioned Brock on or about 22 March 2005, but did not arrest him. His statement did not implicate himself in Smith's murder. On 24 March 2005, police detectives arrived at defendant's home and found him sitting on the front steps. The detectives informed defendant that they wanted to talk to him at the Law Enforcement Center ("LEC"). At first, defendant was reluctant togo with the detectives. The detectives asked if he was aware that Brock had come in for questioning and had not been arrested; defendant stated that he knew that. After the detectives told him, "that's basically what we're going to do with you if you agree to go," he agreed to accompany the detectives to the LEC.
Defendant rode to the LEC in the front seat of the detectives' unmarked car. He was escorted to an interview room and asked if he wanted anything. The detectives got him some chips and a soda. They informed him that he was not under arrest and that he was free to leave at any time. They did not read him his Miranda rights.
Initially, defendant told the detectives that he had last seen Smith between 10 and 15 January 2005. When the detectives expressed their disbelief, defendant held his head down for a few seconds, then raised his head and with tears in his eyes informed them that Brock had stabbed Smith. The detectives questioned defendant for approximately thirty minutes, during which defendant implicated himself. The detectives then informed defendant that they wanted to record his statement and left the room to get an audio recorder. Defendant was left unattended in the interview room for approximately ten minutes.
Defendant's recorded statement lasted for approximately one hour and fifteen minutes. He implicated Brock primarily, but admitted his own involvement by holding Smith's legs while Brock taped them together, failing to seek help during the periods Brock left him alone with Smith, helping carry Smith out of Brock's apartment, helping carry Smith to the lake, and taking Smith approximately ten feet into the water and leaving him there. He indicated that he assisted because Brock threatened him and he was scared.
During the interview, defendant had indicated that he was willing to drive the detectives to several of the locations discussed in his statement. Defendant was left in the interview room for approximately one hour before being escorted to the detectives' vehicle to show them these places. After placing defendant in the front passenger seat of their car, the detectives informed defendant that he was under arrest and read him his Miranda rights. After acknowledging that he understood his rights, defendant signed a juvenile waiver of rights form.
Defendant first directed the detectives to the storm drain where Brock disposed of evidence. He then directed the detectives to the lake where he and Brock disposed of Smith's body. Finally, he directed the detectives to the home of a man who had provided cleaning materials. In all, the trip took approximately two hours. While showing the detectives these locations, defendant had revealed additional information not disclosed in his initial recorded statement; therefore, the detectives asked him if he would be willing to give them a second recorded statement, which he did.
Eventually, Brock pled guilty to second-degree murder and was sentenced to a term of 196 to 245 months in prison. He also pled guilty to first-degree kidnapping and robbery with a dangerous weapon; however, judgment on those charges was continued until after he testified against defendant. Defendant did not file a pre-trial motion to suppress either the first or second recorded statement. Defendant did not object when either statement was introduced into evidence. Audio recordings of both statements were played for the jury. Transcripts of the second recorded statement were published to the jury to read-along while the statement was played aloud.
The jury found defendant guilty of first-degree murder, first-degree kidnapping, and robbery with a dangerous weapon. The trial court sentenced him to a term of life imprisonment without the possibility for parole for the murder charge, followed by a presumptive term of seventy-three to ninety-seven months for the kidnapping charge. For the robbery with a dangerous weapon charge, the trial court set defendant's sixty-four to eighty-six month term to run concurrently with the murder conviction. Defendant appeals.
Defendant first argues that the trial court committed plain error by not suppressing the two recorded statements ex mero motu. We disagree.
In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection or motion.
N.C. R. App. P. 10(b)(1) (2007). However, "[i]n criminal cases, a question which was not preserved by objection noted at trial . . . nevertheless may be made the basis of an assignment of error where the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(c)(4) (2007). "A `plain error' is `a "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done."'" State v. Holloway, 82 N.C. App. 586, 586, 347 S.E.2d 72, 73 (1986) (emphasis in original) (quoting United States v. McCaskill, 676 F.2d 995, 1002 (4th Cir.), cert. denied, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)).
As to the first recorded statement, defendant contends that because he had not been Mirandized, his statement was inadmissible. In Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that a person's statements are not admissible unless, before an officer begins a custodial interrogation, the officer warns the person of various constitutional rights. Id. at 479, 16 L. Ed. 2d at 726 (emphasis added). The defendant may waive these rights provided the waiver is made voluntarily, knowingly, and intelligently. Id. at 444, 16 L. Ed. 2d at 707; see also State v. McRae, 276 N.C. 308, 314, 172 S.E.2d 37, 41 (1970). Miranda applies only when the person being interrogated is in custody.
The test for whether a person is in custody for Miranda purposes is "based on the totality of the circumstances, whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." State v. Buchanan, 353 N.C. 332, 339, 543 S.E.2d 823, 828 (2001) (internal quotation marks omitted); accord Stansbury v. California, 511 U.S. 318, 322, 128 L. Ed. 2d 293, 298 (1994), Oregon v. Mathiason, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719 (1977).
Here, at the time defendant gave his first recorded statement, he was not under formal arrest. Further, his freedom of movement had not been restrained to a degree associated with formal arrest. Immediately prior to beginning the first statement, defendant was left alone in an unlocked interview room for approximately ten minutes. He had been told repeatedly that he was not under arrest and that he was free to leave at any time. He was not placed under formal arrest until one hour after concluding his first recorded statement, at which time he was informed of his Miranda rights.
As to the second recorded statement, defendant contends that it was the inadmissible product of the "Question First" tactic disapproved of in Missouri v. Seibert, 542 U.S. 600, 159 L. Ed. 2d 643 (2004). In Seibert, the United States Supreme Court tested a police protocol for custodial interrogation wherein no Miranda warnings were given until after an interrogation had produced a confession. The interrogating officer then administered Miranda warnings and led the suspect to cover the same ground a second time. The question was whether the repeated statement was admissible. The Court held that it was not because "this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with Miranda's constitutional requirement[.]" Id. at 604, 159 L. Ed. 2d at 650. Here, because defendant was not in custody during the first recorded statement, the first statement was not inadmissible and Siebert does not apply.
Further, the first recorded statement comprised eighty-three pages of transcript while the second recorded statement comprised only thirty-three pages. The second statement did not cover the same ground as the first one; it covered additional ground disclosed while defendant drove to various crime-scene locations with the detectives.
Because defendant's first recorded statement was not obtained while defendant was in custody, Miranda does not apply and the statement was admissible. Defendant's second recorded statement was obtained after defendant was Mirandized, making it admissible as well. Therefore, these assignments of error are overruled.
Defendant also argues that in failing to file a motion to suppress his recorded statements and raise objections upon their introduction into evidence at trial, he was denied the right to effective assistance of counsel. We are not in a position to adequately assess this argument.
This Court may address a defendant's ineffective assistance of counsel claim on direct review "when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." State v. Fair, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001), cert. denied, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002). When such a claim is prematurely brought, this Court may dismiss the claim without prejudice, in order to allow the defendant to reassert the claim by way of a motion for appropriate relief. State v. Campbell, 359 N.C. 644, 691, 617 S.E.2d 1, 30 (2005), cert. denied, 547 U.S. 1073, 164 L. Ed. 2d 523 (2006). "Simply stated, the trial court is in a better position to determine whether a counsel's performance: (1) was deficient so as to deprive defendant of `counsel' guaranteed under the Sixth Amendment; and (2) prejudiced defendant's defense to such an extent that the trial was unfair and the result unreliable." State v. Duncan, 188 N.C. App. 508, 517, 656 S.E.2d 597, 603 (Hunter, J. dissenting) (citing State v. Braswell, 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985)), rev'd, 362 N.C. 665, 666, 669 S.E.2d 738, 738 (2008) (per curiam) ("For the reasons stated in the dissenting opinion of the Court of Appeals, the decision of the Court of Appeals is reversed[.]"). "Counsel is given wide latitude in matters of strategy, and the burden to show that counsel's performance fell short of the required standard is a heavy one for defendant to bear." State v. Fletcher, 354 N.C. 455, 482, 555 S.E.2d 534, 551 (2001), cert. denied, 537 U.S. 846, 154 L. Ed. 2d 73 (2002).
Here, because the alleged errors may have been matters of trial strategy, the trial court is in a better position to review counsel's performance. Pursuant to Campbell, we dismiss this claim without prejudice, so that defendant may reassert the claim in a motion for appropriate relief.
Finally, defendant argues that it is cruel and unusual punishment for him to be sentenced to a mandatory term of life imprisonment without the possibility of parole when he committed the offense when he was only sixteen years old. Defendant concedes that this Court has decided the matter contrary to his assertion and that he raises the issue for preservation purposes only. Therefore, we do not address this assignment of error.
For the reasons stated above, we can discern no prejudicial error in the trial below.
No prejudicial error.
Judges McGEE and Robert N. HUNTER, Jr. concur.
Report per Rule 30(e).