Justice ERVIN dissenting.
Although the determination of whether defendant was "in custody" for Miranda purposes strikes me as an exceedingly close call in this case, I am forced to conclude, given that we are required to employ **168 a "totality of the circumstances" analysis and are bound by the trial court's findings of fact, that defendant was not subjected to "custodial interrogation" when he made the unwarned inculpatory statements which he seeks to suppress. As a result, I respectfully dissent from the Court's decision.
At approximately 8:46 p.m. on 10 December 2012, a group of men robbed Stephanie Gaddy of her purse while threatening her with a handgun. On 11 December 2012, between the hours of 12:45 p.m. and 1:05 p.m., defendant was transported by ambulance and hospitalized as the result of an intentional drug overdose. At about 3:50 p.m. on the same date, a magistrate entered an order involuntarily committing defendant based upon a finding that he was "mentally ill and dangerous to self or others." At 4:32 p.m., the Union County Sheriff's Office took defendant into custody pursuant to the magistrate's order. At about 5:11 p.m. on the following day, while still hospitalized pursuant to the involuntary commitment order, defendant was interrogated by officers of the Monroe Police Department for approximately one hour and twenty-eight minutes, during which time he made a number of inculpatory statements without ever having been advised of his Miranda rights.
In denying defendant's suppression motion, the trial court found, in pertinent part, that:
7) Jan Kinsella, nurse overseeing defendant at the time, gave permission for Detectives to speak with defendant. She informed them he was awake, conscious and alert and any medications given to defendant "should be out of his system by this time".
8) That defendant's room was located in the Emergency Department. The room had a solid door, with a full glass panel to the outside. This door was not locked during the interview.
9) When the officers entered the room, defendant was in a hospital gown in his bed, and Detective Williams sat against the back wall. [Officer] T.J. Goforth sat at the foot of defendant's bed.
10) There was no bathroom inside defendant's room. To leave the room, a patient must go to the door, open it and summon hospital personnel to accompany him or her. According to hospital records, defendant was ambulatory.
**169 11) The officers were dressed in street clothes, but with visible badges and carrying weapons. They did not identify themselves as members of the Monroe Police Department, but did give first names at some point.
12) Before questioning, the officers asked permission to sit down, which was granted by defendant. Neither officer blocked the door.
13) No law enforcement officer sat outside defendant's room.
14) Outside the room was assigned a "sitter", a person charged to keep eyes on the *446 defendant at all times, pursuant to his status as an involuntary commitment, although neither Defendant nor Officer Williams recalled seeing such at the time of the interview.
15) The officers announced immediately that they were not there to arrest the defendant and they did not have warrants for his arrest. This statement was repeated in various ways throughout the interview....
16) The officers a) never informed the defendant he could leave. In fact, his involuntary commitment status, although civil in nature, effectively confined him to the hospital; b) never informed the defendant he could tell them to leave; and c) never informed the defendant he could ask them to stop talking or he could stop talking to them and end the questioning.
17) The officers did inform him that as soon as he talked, they could leave. The defendant was not in restraints or handcuffs; and was not arrested or served with warrants while at CMC-Union.
18) The defendant was never threatened.... The defendant was never isolated without the ability to contact others.
19) The interview with defendant was tape recorded, without the knowledge of the defendant. The tape is approximately one and one-half (1 ½) hours in length; about half of which concerned a theft at the defendant's workplace. The defendant is questioned last about the armed robbery.
**170 20) In the background on the tape, an intercom blares loudly on several occasions. At other times, conversations are heard other than the one between the officers and the defendant. When questioned, Officer Williams describes the Emergency Room as "a very busy place". The defendant never asked to stop the interview, never complained of pain or discomfort, never asked for a break, or for food, beverage, etc.
21) The words spoken by both officers and defendant are conversational and cordial in tone. No voices were raised. The two officers' interrogation does not reveal a "good cop/bad cop" technique; more "very nice cop/nice cop" or at worse, "nice cop/(merely) pleasant cop".
22) The officers do continue the interview until an admission is made; and confront the defendant when they seem to believe he was being less than truthful. The interview is monotonic in tone....
....
58) Defendant had been involuntarily committed as a result of an intentional overdose; he was not free to leave the hospital by virtue of this status; no Miranda rights were given to defendant by law enforcement who were carrying badges and firearms. Defendant was never told he could ask law enforcement to stop questioning or to leave. Defendant had been administered medications in the late evening/early morning hours by physicians and had taken some amount of white pills late December 10, 2012 and early December 11, 2012; some of which may have remained in his system at the time of the interview.
59) Defendant was interviewed by two (2) detectives from the Monroe Police Department, they were in street clothes, asked permission to sit down (which was given by defendant), did not block the door; were in a room within the emergency department with a blaring loudspeaker and where conversations outside the room could be heard; that defendant was not handcuffed and was not restrained by law enforcement or the hospital, that the door to the room was glass and a sitter was assigned to observe the defendant, that the room had no bathroom, but the patient could walk to the door, open it and request personnel to **171 accompany the patient to the bathroom (or make other requests of staff); that the interview was approximately 1 ½ (one and one half) hours in length (relatively short); that defendant was repeatedly told he was not under arrest and no warrants had been issued; that the conversation was calm and cordial in tone, that the detectives offered food or drink after the interview and promised nothing except to relay to the District Attorney the defendant's cooperation; that any residual drugs in his system were anti-anxiety or sleep-inducing; as described by the testifying experts; and *447 seemingly lessening, in defendant's mind, the potential of coercion by officers; after carefully weighing the totality of the circumstances, even the facts of defendant's involuntary commitment and the (very important) factor that defendant was never told he could end the questioning, this Court determines by the preponderance of the evidence that the defendant was not coerced to give his statement on December 12, 2012; and the circumstances surrounding the defendant at the time and date in question show, considering the totality of the circumstances, that defendant was not in custody requiring Miranda Rights to be given.
In light of these findings of fact, the trial court concluded as a matter of law that "[a] reasonable person in defendant's position at the time of the interview would not have believed that he was in the custody of law enforcement" and that "[t]he statements made by defendant were made when defendant was not in custody for purposes of ... Miranda." As a result, the trial court denied defendant's suppression motion.
According to well-established North Carolina law, the standard utilized in reviewing the "denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." State v. Jackson , 368 N.C. 75, 78, 772 S.E.2d 847, 849 (2015) (quoting State v. Otto , 366 N.C. 134, 136, 726 S.E.2d 824, 827 (2012) ). "[T]he trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.' " State v. Buchanan , 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (quoting State v. Brewington , 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000), cert. denied , 531 U.S. 1165, 121 S.Ct. 1126, 148 L.Ed.2d 992 (2001) ). "[T]he trial court's conclusions of law must be legally correct, reflecting a correct application of applicable legal principles to the facts found." Id . at 336, 543 S.E.2d at 826 (alteration **172 in original) (quoting State v. Golphin , 352 N.C. 364, 409, 533 S.E.2d 168, 201 (2000), cert. denied , 532 U.S. 931, 121 S.Ct. 1379, 149 L.Ed.2d 305 (2001) ).
"[T]he initial inquiry in determining whether Miranda warnings were required is whether an individual was 'in custody.' " Id . at 337, 543 S.E.2d at 826. In Miranda , the United States Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona , 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). The extent to which a person is "in custody" for Miranda -related purposes depends upon "whether a reasonable person in defendant's position, under the totality of the circumstances, would have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest." Buchanan , 353 N.C. at 339-40, 543 S.E.2d at 828.
As the United States Supreme Court has recently stated, "[n]ot all restraints on freedom of movement amount to custody for purposes of Miranda ," with the relevant test requiring the reviewing court to focus upon "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda ." Howes v. Fields , 565 U.S. 499, 509, 132 S.Ct. 1181, 1189-90, 182 L.Ed.2d. 17, 27 (2012).
In the paradigmatic Miranda situation-a person is arrested in his home or on the street and whisked to a police station for questioning-detention represents a sharp and ominous change, and the shock may give rise to coercive pressures. A person who is "cut off from his normal life and companions" and abruptly transported from the street into a "police-dominated atmosphere" may feel coerced into answering questions.
By contrast, when a person who is already serving a term of imprisonment is questioned, there is usually no such change.... For a person serving a term of incarceration, ... the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the same "inherently compelling pressures" that are often present when a suspect is yanked from familiar surroundings *448 in the outside world and subjected to interrogation in a police station.
**173 Id . at 511, 132 S.Ct. at 1190-91, 182 L.Ed.2d at 29 (quoting Maryland v. Shatzer , 559 U.S. 98, 104-106, 113, 130 S.Ct. 1213, 1219-20, 1224, 175 L.Ed.2d 1045, 1054 and Miranda , 384 U.S. at 456, 86 S.Ct. at 1618, 16 L.Ed.2d at 713 ). As a result, a person who is already subject to restraint for some reason, such as imprisonment or service of an involuntary commitment order, is not automatically deemed to be "in custody" for Miranda -related purposes. Instead, the necessary restraint equivalent to that associated with a formal arrest must stem from factors that are extraneous to the existing restraint.
After carefully reviewing the trial court's findings of fact, I am satisfied that they support a conclusion that a "reasonable person in defendant's position" would not "have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest." Buchanan , 353 N.C. at 339-40, 543 S.E.2d at 828. As the trial court found, (1) the officers spoke with defendant for approximately ninety minutes in a hospital; (2) on several occasions during the interrogation, the officers clearly informed defendant that he was not under arrest, stating, among other things, that they did not possess warrants for defendant's arrest and "that they were not here to 'lock you up' "; (3) defendant was not handcuffed or formally placed under arrest prior to or during the interrogation; (4) nurses entered and left defendant's room during the interrogation; (5) defendant never lacked the ability to contact others during the interrogation; and (6), while the officers did press defendant on occasion, the interrogation was conducted in a conversational and even "monotonic" manner rather than in a confrontational tone.
As the Court notes, defendant was never asked if he wished to speak to the officers; the officers never told defendant that he could end the interrogation or ask the officers to leave; and the officers did tell defendant that, "after we talk about this, we're going to get up and walk out and you can have your supper and you can watch some Christmas shows on TV and rest, okay." Although these facts admittedly do, as my colleagues suggest, tend to cut in favor of a finding that defendant was "in custody" for Miranda -related purposes, I am not persuaded, in light of the totality of the circumstances, that they necessitate a finding to that effect, particularly given the fact that defendant was not isolated from civilian influences and the officers' repeated assurances that defendant was not under arrest and would not be placed under arrest during the time that he was being questioned. In fact, the officers' repeated assurance that defendant was not under arrest seems to me to be more directly relevant to the required "in custody" analysis than their failure to inform **174 defendant that he could end the interrogation whenever he chose to do so. Similarly, the officers' statement that they would leave once they finished "talk[ing] about this" with defendant does not, when taken in context, strike me as a threat that the conversation would continue until defendant confessed, given that such a "talk" could have concluded with a refusal on defendant's part to answer the officers' questions. When all the information reflected in the trial court's findings is considered as a unified whole and in light of the relevant legal standard, I am compelled to conclude that a reasonable person in the position in which defendant found himself would not believe that he was "under arrest or was restrained in his movement to the degree associated with a formal arrest." Buchanan , 353 N.C. at 339-40, 543 S.E.2d at 828. As a result, since the features of a "paradigmatic Miranda situation" are simply not present in this case, I respectfully dissent from my colleagues' determination that defendant's inculpatory statements were obtained in violation of Miranda .
CHIEF JUSTICE MARTIN and JUSTICE NEWBY join in this dissenting opinion.