Harold Gene Cable, Jr. v. The State of Texas

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-332-CR

HAROLD GENE CABLE, JR. APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 97
TH
 DISTRICT COURT OF MONTAGUE COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

A jury convicted Appellant Harold Gene Cable of murder upon his plea of guilty, and, rejecting his sudden passion defense, assessed his punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice and a $10,000 fine.  The trial court sentenced him accordingly.  Appellant brings a single point on appeal, challenging the trial court’s denial of his motion to suppress.  Because we hold that the trial court correctly denied the motion to suppress, we affirm the trial court’s judgment.

The evidence showed that on October 16, 2002, Appellant and his girlfriend, Carol Sanderson, were shooting guns in a wooded area near his parents’ lake cabin.  Appellant called his family members and asked them to come to the lake cabin because something terrible had happened.  When Appellant’s parents and sister arrived, Appellant told them that he had shot Sanderson in a hunting accident as they walked through the woods around the cabin but that no one would believe that it was an accident.  Appellant’s family called 911 to report the shooting.  Appellant ran off into the woods before the police or ambulance personnel arrived.

Over the next several hours, police and emergency personnel searched for Sanderson to determine whether she was dead or alive, but they could not locate her.  Appellant finally reappeared at the cabin at around 8:20 p.m.  A number of people were present, including police, emergency personnel, and family and friends of Appellant.  Sheriff Chris Hamilton asked Appellant to step into a van the police were using as a mobile command center.  Hamilton and Texas Ranger Dwayne Dockery wanted to speak privately with Appellant without anyone eavesdropping.  The record reflects that Appellant was not under arrest at that point because neither Sheriff Hamilton nor Ranger Dockery believed probable cause existed.

When Ranger Dockery asked Appellant if he would talk to them about what had happened, he responded that he did not want to talk to the officers until he talked to an attorney.  He did agree, however, to show the officers where he had left Sanderson in the woods.  Appellant led the officers into the woods.  Before crossing a barbed-wired fence, Ranger Dockery realized that he and Sheriff Hamilton had not checked Appellant for weapons.  As a safety precaution, Dockery asked Appellant if he had any weapons on his person.  In response to Dockery’s question, Appellant stated that he did not have any weapons and that the police officers already had the weapon that he “did it with.”  Dockery frisked Appellant anyway, and, after Dockery discovered no weapons, Appellant continued to lead Dockery and Hamilton deeper into the woods to Sanderson.

The record reflects that as Dockery and Hamilton followed Appellant into the woods, they did not question him.  Even though they did not question Appellant, they testified that he began to volunteer statements about the circumstances of the shooting.  Dockery testified that Appellant stated:

he had been seeing the victim for a while and that he had been drinking vodka since early that morning.  They had got[ten] into an argument, and [he] just went off.

 . . . .

He said that he had told his dad it was an accident, but the only accident was what he had done.  What I did. 

Both officers claimed that they simply listened to statements Appellant made without asking him to clarify or explain.  At one point late in the search, Appellant told Dockery that he “was going on the run, but he decided that wasn’t the best thing to do.”  Appellant asked Dockery whether Dockery thought “that [was] the best thing to do, get it taken care of.”  Dockery responded, “I think we just need to take care of this.”  Appellant led Dockery and Hamilton to Sanderson’s body, which was located near a stock pond.  Sanderson appeared to have been shot twice, and the officers decided they had probable cause to arrest Appellant for the murder of Sanderson.  They placed Appellant under arrest and gave him his 
Miranda
(footnote: 2) 
warnings.  He refused to make any further statements.

After a hearing on Appellant’s motion to suppress his statements, the trial court found that the statements were voluntary, noncustodial statements and denied Appellant’s motion to suppress.  Appellant correctly argues that an essential question is whether he was in custody at the time he made the statements.

In 
Miranda
 the United States Supreme Court was unequivocal in holding that an accused who is held in custody must be given the required warning before any questioning.
(footnote: 3)  The United States Supreme Court defines custodial interrogation in 
Miranda
 as “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.”
(footnote: 4)  When law enforcement officers fail to warn a person in custody, the State forfeits the use of any statement obtained from that interrogation during its case-in-chief.
(footnote: 5)
 We do not base our determination of whether an accused was in custody upon whether a police officer has spoken the words “arrest” or “in custody.”
(footnote: 6)  Although the Texas Court of Criminal Appeals has, in the past, utilized a four-factor test in determining whether someone is in custody, the court discontinued this practice in 
Dowthitt v. State
 in favor of determining custody “on an
 ad hoc
 basis, after considering all of the (objective) circumstances.”
(footnote: 7)  Under 
Dowthitt
, custody is established when:  (1) an officer has probable cause to arrest a suspect and does not tell him that he is free to leave; (2) the officer manifests this knowledge to the suspect; and (3) a reasonable person in a suspect’s position would believe that he is under restraint to the degree associated with an arrest.
(footnote: 8)  The ultimate inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.
(footnote: 9)  This determination depends on the objective circumstances, not on the subjective views of either the interrogating officers or the person being questioned.
(footnote: 10)
 The officers in the case now before this court testified that they did not have probable cause to arrest when they first began talking to Appellant.  Appellant testified and did not contradict any essential statement by the officers.  Appellant had admitted to shooting Sanderson, but claimed it was an accident.  The officers did not know whether Sanderson was dead or alive when they first began talking to Appellant.  They had not examined her injuries, and they had no information other than Appellant’s statement that the injury to Sanderson was accidental.  The officers’ primary concern at the time they talked to Appellant at the command center was to locate Sanderson in case she could benefit from medical treatment.  Appellant offered to take them to Sanderson but informed them without having received the 
Miranda
 warning that he did not want to talk to them until he talked to a lawyer.

The uncontroverted testimony is that the statements Appellant made after that point were volunteered, except for the statement regarding his not having a weapon on his person.  We see no significant difference between asking Appellant if he was carrying a weapon and searching him to determine whether he was carrying a weapon.  The pat-down search was, of course, lawful.
(footnote: 11)  We hold that this single inquiry does not constitute questioning under the facts of this case.  Additionally, Appellant indicated that he believed he was free to leave by discussing with the police officers the benefit of running away. In reviewing a ruling on a motion to suppress, we review de novo the trial court’s rulings on application of law to fact questions that do not turn upon credibility and demeanor.
(footnote: 12)  Because Appellant did not controvert the testimony of the officers in any material way, the de novo standard applies.  Applying this standard of review, we hold that when Appellant was assisting Sheriff Hamilton and Ranger Dockery to locate Sanderson, he was not in custody as contemplated by 
Miranda
.  Additionally, we point out that even if he had been in custody, the inculpatory statements he made were volunteered and not in response to questioning by law enforcement officers.

We hold, therefore, that the trial court did not abuse its discretion in overruling Appellant’s motion to suppress his statements.  We overrule Appellant’s sole point and affirm the trial court’s judgment.

LEE ANN DAUPHINOT

JUSTICE

PANEL A: LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: April 28, 2005

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
Miranda v. Arizona
, 384 U.S. 436, 86 S. Ct. 1602 (1966).

3:
Id.
 at 444, 86 S. Ct. at 1612.

4:
Id.

5:
Jones v. State
, 119 S.W.3d 766, 772 (Tex. Crim. App.), 
cert. denied
, 124 S. Ct. 2836 (2004).

6:
Oregon v. Mathiason
, 429 U.S. 492, 495, 97 S. Ct. 711, 713-14 (1977).

7:
931 S.W.2d 244, 254-55 (Tex. Crim. App. 1996) (emphasis added).

8:
Id. 
at 255.

9:
Stansbury v. California
, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528-29 (1994).

10:
Id.
 at 322-23, 114 S. Ct. at 1528-29.

11:
See Terry v. Ohio
, 392 U.S. 1, 24-25, 88 S. Ct. 1868, 1881-82 (1968).

12:
Ripkowski v. State
, 61 S.W.3d 378, 381-82 (Tex. Crim. App.), 
cert. denied
, 539 U.S. 916 (2003);
 Guzman v. State
, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).