ACCEPTED
02-17-00413-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
12/20/2017 1:51 PM
DEBRA SPISAK
CLERK

No. 02-17-00413-CV

IN THE COURT OF APPEALS FOR THE SECOND DISTRICT
FORT WORTH, TEXAS

FILED IN
2nd DISTRICT COURT APPEALS
FORT WORTH, TEXAS
12/20/2017 1:51:56 PM
DEBRA SPISAK
Clerk

THE CITY OF FORT WORTH

Appellant,

v.

MARY DEAL,

Appellee.

On Appeal from the 342nd District Court
of Tarrant County, Texas, Cause No. 342-289469-16
the Honorable Wade Birdwell, Presiding

BRIEF OF APPELLANT

Laetitia Coleman Brown
State Bar No. 00792417
Laetitia.brown@fortworthtexas.gov

Lynn Winter
State Bar No. 24078135
Lynn.winter@fortworthtexas.gov

CITY OF FORT WORTH
200 Texas Street
Fort Worth, Texas 76102
817.392.7600—Telephone
817.392.8359—Telecopier

ATTORNEYS FOR APPELLANTS

ORAL ARGUMENT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

**Appellants/Defendants:**

The City of Fort Worth


**Counsel for Appellant/Defendant:**

Laetitia Coleman Brown
State Bar No. 00792417
Laetitia.brown@fortworthtexas.gov

Lynn Winter
State Bar No. 24078135
Lynn.winter@fortworthtexas.gov

**CITY OF FORT WORTH**
200 Texas Street
Fort Worth, Texas  76102
817.392.7600—Telephone
817.392.8359—Telecopier


**Appellee/Plaintiff:**

Mary Deal


**Counsel for Appellee/Plaintiff:**

Joe Riddell
P.O. Box 41898
Austin, Texas 78704
(512) 663-4669
joeriddell@aol.com

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL ..........................................................i

INDEX OF AUTHORITIES..........................................................................iv

STATEMENT OF THE CASE........................................................................vi

STATEMENT REGARDING ORAL ARGUMENT ............................................ vii

ISSUES PRESENTED...................................................................... viii

INTRODUCTION ....................................................................................1

STATEMENT OF FACTS .............................................................................2

SUMMARY OF THE ARGUMENT ...................................................................3

ARGUMENT AND AUTHORITIES..................................................................3

I.  Standard of review ......................................................................3

II.  The Trial Court erred in denying the City's Plea to the Jurisdiction
because Appellee alleged intentional torts under the
Texas Tort Claims Act ..............................................................4

    A.  The Texas Tort Claims Act ................................................4

    B.  The deploying of the tire deflation device was an arrest and
therefore an intentional tort .............................................6

    C.  The act of deploying a tire deflation device is an intentional tort ........7

    D.  The act of deploying a tire deflation device is a battery ......................9

PRAYER ..............................................................................................11

CERTIFICATE OF COMPLIANCE ...................................................................12

CERTIFICATE OF SERVICE ........................................................................13

INDEX TO APPENDIX ................................................................................14

# INDEX OF AUTHORITIES

**Cases:**                                                                               **Page**

*Bland Independent School District v. Blue*,
34 S.W.3d 547 (Tex. 2000)......................................................................................4

*City of Amarillo v. Martin*,
971 S.W.2d 426 (Tex. 1998)....................................................................................4

*City of Borger v. Garcia*,
290 S.W.3d 325 (Tex.App.—Amarillo 2009, pet. denied)..................................3, 4

*City of Fort Worth v. Chattha*,
No. 02-11-00342-CV, 2012 Tex.App. LEXIS 1264, 2012 WL 503223,
(Tex.App.—Fort Worth Feb. 16, 2012, no pet.).......................................................10

*City of Laredo v. Nuno*,
94 S.W.3d 786 (Tex.App.—San Antonio 2002, no pet.).........................................7

*City of Lubbock v. Nunez*,
279 S.W.3d 739 (Tex.App.—Amarillo 2007, pet. granted and dism'd by agr.) .9, 10

*City of Waco v. Williams*,
209 S.W.3d 216 (Tex.App.—Waco 2006, pet. denied)....................................8, 10

*City of Watauga v. Gordon*,
434 S.W.3d 586 (Tex. 2014)................................................................................6, 10

*Durbin v. City of Winnsboro*,
135 S.W.3d 317 (Tex.App.—Texarkana 2004, pet. denied)...................................9

*Fisher v. Carrousel Motor Hotel, Inc.*,
424 S.W.2d 627 (Tex. 1967)...................................................................................10

*Harris County v. Cabazos*,
177 S.W.3d 105 (Tex.App—Houston [1st Dist.] 2005, no pet.)..........................6, 7

*Mo. Pac. R.R. v. Brownsville Navigation Dist.*,
453 S.W.2d 812 (Tex. 1970).....................................................................................4

# INDEX OF AUTHORITIES (cont.)

**Cases:**                                                                    **Page**

*Pineda v. City of Houston*,
175 S.W.3d 276 (Tex.App.—Houston [1ˢᵗ Dist.] 2004, no pet.)..........................8, 9

*Stansbury v. California*,
511 U.S. 318; 114 S.Ct. 1526; 128 L. Ed.2d 293 (1994) ..........................................6

*Tex. Department of Transp. v. Jones*,
8 S.W.3d 636 (Tex. 1999)....................................................................................3

*Tex. Dep't. of Public Safety v. Petta*,
44 S.W.3d 575, 44 Tex. Sup. J 597 (Tex. 2001) ...................................................7, 8

**Rules and Statutes:**

Tex. Civ. Prac. & Rem. Code § 101.021 ....................................................*per curiam*

Tex. Civ. Prac. & Rem. Code § 101.057 ..........................................................5, 7

## STATEMENT OF THE CASE

**Nature of the Case:** This is an appeal from the denial of a plea to the jurisdiction. Appellee filed her original petition alleging that the City was liable for damages under the Texas Tort Claims Act. Appellee alleges that her son was killed when an officer deployed a tire deflation device during a police pursuit involving her son.

**Trial Court:** The 342nd Judicial District Court, Tarrant County, Texas, Cause No. 342-289469-16, the Honorable Wade Birdwell, presiding.

**Trial Court's Disposition:** The City filed a Plea to the Jurisdiction. [1 CR 9]. The trial court partially granted and partially denied the City's Plea. [1 CR 299]. In denying the City's Plea, the Court determined that the allegations in Appellee's Petition did not allege an Intentional Tort for which the City would have been entitled to governmental immunity under the Texas Tort Claims Act.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rule of Appellate Procedure 38.1(e), the City requests oral argument. The legal issues involve a determination as to what constitutes an intentional tort under the Texas Tort Claims Act. The Court's decisional process will be aided significantly by oral argument, which will help to emphasize, clarify, and focus the facts and legal arguments presented in the briefs.

# ISSUES PRESENTED

Did the trial court err in denying the City's Plea to the Jurisdiction, determining that the deployment of a tire deflation device was not an intentional tort under the Texas Tort Claims Act?

# INTRODUCTION

Jakob Lange, the son of Appellee, led police officers on a police pursuit through residential neighborhoods lasting several minutes. During the pursuit, Lange drove in excess of the speed limit and disregarded several stop signs and red lights. The pursuit ended when Lange lost control of the vehicle and struck a tree. Lange later died.

Appellee brought suit against the City alleging both federal and state law violations. The federal court dismissed all federal causes of actions and remanded the state causes of action back to state court. In her state cause of action Appellee alleged that an unknown Fort Worth police officer negligently deployed a tire deflation device ("TDD") that caused Lange to lose control of the vehicle.

The City denies that any of its police officers deployed a TDD. However, based on the Appellee's pleadings, the City filed a Plea to the Jurisdiction contending that Appellee's allegation that an officer deployed a TDD was an intentional tort. The City also contended it maintained its governmental immunity from Appellee's allegations of negligent training, negligent supervision, and negligent entrustment. The trial court granted the City's Plea on all issues related to negligent supervision, negligent entrustment, and negligent training. Appellee has not appealed. However, the trial court denied the City's Plea to the Jurisdiction with respect to its contention that the conduct complained of amounted to an intentional tort.

Appellee's allegations that a City employee deployed a TDD alleges an intentional tort. The City's governmental immunity is not waived and the Court should reverse the trial court's denial of its plea and render judgment for the City.

## STATEMENT OF FACTS

On February 7, 2013, Officer T. G. Shelton and Officer R. Mask were on duty as police officers with the City of Fort Worth Police Department. [1 CR 50]. Both officers were in uniform and in separate marked police units. [1 CR 50]. The officers were parked in the Bank of America/Kroger parking lot located at 3120 S. University Drive. [1 CR 50]. This area is near Texas Christian University and local bars, and is a high pedestrian area. [1 CR 50]. There is a crosswalk for pedestrian traffic located at the intersection of S. University and W. Berry Street. [1 CR 50]. Officer Shelton noticed a group of people in the median of the crosswalk. [1 CR 50]. Officer Shelton then noticed one of the individuals grab the arm of another individual to prevent him from continuing across the south bound side of the crosswalk. [1 CR 50]. Officer Shelton then observed a dark colored vehicle travelling at a high rate of speed going south bound on University through the W. Berry intersection. [1 CR 50-51]. Officer Shelton was able to maintain visual contact on the vehicle and observed the driver proceed through a red light and make an illegal left turn onto Granbury Road. [1 CR 51]. Officer Shelton activated the emergency lights and the siren on his police vehicle, and attempted to conduct a

traffic stop of the vehicle. [1 CR 51]. The driver of the vehicle, later identified as Jakob Lange, would not stop. [1 CR 51]. Lange continued to drive at a high rate of speed as he led police officers on a vehicle pursuit lasting several minutes. [1 CR 51]. The pursuit was recorded by the in-car video contained in Officer Shelton's police vehicle. [1 CR 51-52.] [In Camera Video attached to Exhibit A]. Lange can be observed on the video running through several stop signs, and at least two red lights. [1 CR 51]. The pursuit ended when Lange lost control of the vehicle and crashed into a tree. [1 CR 52]. Lange later died.

## SUMMARY OF THE ARGUMENT

The trial court erred in denying the City's Plea to the Jurisdiction. Appellee alleged that an unknown police officer deployed a TDD. Although Appellee couched the allegation as a negligent deployment, the facts alleged by Appellee allege an intentional tort. Governmental immunity is not waived for intentional torts and therefore the City is entitled to dismissal of this action.

## ARGUMENT AND AUTHORITIES

### I.    Standard of review.

A plea to the jurisdiction contests a trial court's subject matter jurisdiction. *Texas Department of Transp. V. Jones*, 8 S.W.3d 636, 638 (Tex. 1999); *City of Borger v. Garcia,* 290 S.W.3d 325, 329 (Tex. App.—Amarillo 2009, pet. denied).

The plea is used to defeat a cause of action without regard to whether the claims asserted have merit. *Garcia,* 290 S.W.3d at 329; *Bland Independent School District v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The purpose of the plea "is not to force the plaintiff to preview their case on the merits but to establish a reason why the merits of the plaintiff's claims should never be reached." *Bland,* 34 S.W.3d at 554. Whether a court has subject-matter jurisdiction is a question of law that is reviewed *de novo* on appeal. *Garcia,* 290 S.W.3d at 329.

## II. The trial court erred in denying the City's Plea to the Jurisdiction because Appellee's alleged intentional torts under the Texas Tort Claims Act.

### A. The Texas Tort Claims Act

Generally, a municipality in Texas is immune from tort liability under the doctrine of governmental immunity. *City of Amarillo v. Martin*, 971 S.W.2d 426, 427 (Tex. 1998). The party suing a governmental entity must allege consent to suit either by statute or express legislative permission. *Mo. Pac. R.R. v. Brownsville Navigation Dist.*, 453 S.W.2d 812, 813-14, (Tex. 1970). The Act waives governmental immunity in certain circumstances, and to a limited extent; Section 101.021 of the Act contains the primary waiver provisions found in the Act. That section states:

"A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

    (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

    (B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law."

In order to maintain a cause of action against a governmental entity such as the City of Fort Worth, a plaintiff must make some allegation arising under one of the waivers contained within § 101.021. However, even if a Plaintiff can assert a cause of action under Section 101.021, §101.057 of the Act *reinstates* immunity for certain claims, such as intentional torts. Section 101.057, "Civil Disobedience and Certain Intentional Torts", states in pertinent part:

"This chapter does not apply to a claim:

(2) arising out of assault, battery, false imprisonment, or any other intentional tort, including a tort involving disciplinary action by school authorities."

Furthermore, Courts have held that "If a plaintiff pleads facts which amount to an intentional tort, no matter if the claim is framed as negligence, the claim generally is for an intentional tort, and is barred…" *Harris County v. Cabazos*, 177 S.W.3d 105, 111 (Tex.App.—Houston [1st Dist.] 2005, no pet.).

## B. The Deploying of the Tire Deflation Device Was An Arrest and Therefore an Intentional Tort

An officer commits an arrest when he or she deprives a person of the freedom of movement. *Stansbury v. California*, 511 U.S. 318, 322; 114 S.Ct. 1526, 128 L. Ed.2d 293 (1994). In *City of Watauga v. Gordon*, the Texas Supreme Court held the "actions of a police officer in making an arrest necessarily involve a battery, although the conduct may not be actionable because of privilege." *Gordon* at 591. This is the case even if the suspect yields to the arrest, because submitting against one's will is not the same as consent. *Id.*

In this case, the officer who deployed the TDD would have intended the action to restrain Lange's movement, in other words he or she would have been arresting Lange. The harm would have been the restrained freedom, therefore the actions of the officer amounted to an arrest, an intentional tort for which the City is immune from liability.

## C. **The Act of Deploying a Tire Deflation Device in an Intentional Tort**

Even if the act of deploying the TDD was not an arrest, the City would still be entitled to dismissal of the action because the act of deploying the TDD was an intentional tort, for which that City is entitled to immunity.

Courts have historically taken two distinct approaches when determining whether an officer's actions are an intentional tort under Section 101.057 of the Texas Tort Claims Act. Some courts have held that the intentional tort exception is met if the governmental actor intended the act that caused the injury complained of. See *Tex. Dep't of Public Safety v. Petta*, 44 S.W.3d 575, 580, 44 Tex. Sup. J. 597 (Tex. 2001) (Claim that an officer was negligent by ignoring police procedure and aiming a gun, blocking the vehicle and firing at a suspect's tires was an intentional tort); See also *Harris County v. Cabazos,* 177 S.W.3d 105 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (Claim that a sheriff deputy wrongfully shot suspect was an intentional tort claim, although couched as negligence.); *City of Laredo v. Nuno*, 94 S.W.3d 786 (Tex. App.—San Antonio 2002, no pet.) (Claim of negligence in improperly applying handcuffs and improperly placing suspect in police vehicle were based on the intentional act of excessive force, an intentional tort.)

There is no dispute that the act of deploying a TDD is an intentional act. In order for an officer to deploy the TDD the officer must stop the police vehicle, open the trunk, release the TDD from its mount, unlock the cord reel, throw the sleeved

TDD on the road, lock the cord reel, hold the TDD by the handle and then pull the TDD into the path of the target vehicle. [1 CR 33]. After the device has been struck, the officer must then remove the device from the roadway to prevent other vehicles from striking the device. [1 CR 33]. The act of deploying a tire deflation device should be treated the same as an officer deploying a Taser or drawing and firing a firearm. See *City of Waco v. Williams,* 209 S.W.3d 216 (Tex. App.—Waco 2006, pet. denied) (Officer's use of a Taser was an intentional tort); See also *Pineda v. City of Houston,* 175 S.W.3d 276, 282-284 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (Officer who shot individual committed an intentional tort despite Plaintiff's contention that the Texas Tort Claims Act applied because officer handled the firearm in a negligent fashion).

Appellee contends that the unknown officer may have been negligent in deciding where to deploy the tire deflation device, and/or failing to abide by City policies. The deploying of the TDD is the actual focus of Appellee's complaint, and the act of deploying the TDD is an intentional tort. However, as the Court determined in *Petta*, a party cannot maintain a negligence claim under the Texas Tort Claims Act for the "same conduct" as the intentional tort. *Petta* at 580. See also *Pineda* at 283 (finding that despite Plaintiff's contention that officers were negligent by failing to exercise sound judgment in shooting individual, the real focus was on the shooting of the individual which was an intentional tort).

### D. **The Act of Deploying the Tire Deflation Device is a Battery**

Appellee's Original Petition stated that she was not alleging an intentional tort because she was not alleging that officers intended to injure or harm Lange by deploying the TDD. See *Durbin v. City of Winnsboro*, 135 S.W.3d 317 (Tex. App.—Texarkana 2004, pet. denied) (intentional tort exception did not apply to an officer who intentionally bumped a motorcycle during a pursuit causing the suspect to wreck and get run over by a police vehicle because the officer did not intend to injure the suspect but simply to end the pursuit). In fact, Appellee's Response to the City's Plea to the Jurisdiction extensively quotes the Seventh District Court of Appeals opinion in *City of Lubbock v. Nunez*, 279 S.W.3d 739 (Tex. App.—Amarillo 2007, pet. granted and dism'd by agr). *Nunez* involved an officer who deployed a Taser on an individual who later died. The Court held that the Plaintiff pled a cause of action for negligence because the Plaintiff did not allege that the officer intended to cause Nunez injury. The Court found that they could not infer an intent to injure, because at the time the Taser was advertised as "non-lethal." *Nunez* at 743. The case was appealed to the Texas Supreme Court and petition was granted. The petition was later dismissed by agreement of the parties.

The Texas Supreme Court addresses these lines of cases in *City of Watugua v. Gordon*. 434 S.W.3d at 594. In *Gordon* the City calls the *Nunez* decision

"doctrinally unsound." The Court then comprehensively discusses the law of battery and how it applies to intentional torts under the Texas Tort Claims Act.

The Court held that a battery occurs when 1) a person intentionally or knowingly causes bodily injury; or 2) a person intentionally or knowingly causes an offensive bodily contact. *Id. at 590.* Battery does not require the intent to injure. It only requires an "offensive bodily contact." See *City of Fort Worth v. Chattha*, No. 02-11-00342-CV, 2012 Tex. App. LEXIS 1264, 2012 WL 503223, at *6 (Tex. App.—Fort Worth Feb. 16, 2012, no pet.) [**9] (Allegation that officer took complainant to the ground amounted to an offensive touching and was therefore a battery under the Texas Tort Claims Act). In fact, battery does not even require the accused to make physical contact with the complainant. See *Fisher v. Carrousel Motor Hotel, Inc.* 424 S.W.2d 627, 629 (Tex. 1967) (Individual who snatched a plate from the Plaintiff's hand committed a battery, even though the individual never made physical contact with the Plaintiff). See also *City of Waco v. Williams,* 209 S.W.3d 216 (Tex. App.—Waco 2006, pet. denied) (Officer who used a Taser on a suspect who later died committed an intentional tort and therefore the City's sovereign immunity was not waived).

Deal alleges that that the TDD made contact with the tire on the vehicle being driven by Lange while Lange was fleeing from police officers. The contact as described by Deal amounts to a battery, a touching that was not consensual. Because

a battery is an intentional tort for which governmental immunity is not waived, the trial court erred in dying the City's Plea to the Jurisdiction and the City is entitled to dismissal of the cause of action against it as a matter of law.

## **PRAYER**

For all of the reasons set forth above, the City respectfully requests that this Court reverse the trial court's order partially denying the City's plea and render judgment for the City and grant any other relief, whether at law or in equity, that the City is justly entitled to receive.

Respectively submitted,

*/s/ Laetitia Coleman Brown*
Laetitia Coleman Brown
State Bar No. 00792417
Laetitia.brown@fortworthtexas.gov

Lynn Winter
State Bar No. 24078135
Lynn.winter@fortworthtexas.gov

**CITY OF FORT WORTH**
200 Texas Street
Fort Worth, Texas  76102
817.392.7600—Telephone
817.392.8359—Telecopier

**ATTORNEYS FOR APPELLANTS**

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Texas Rule of Appellate Procedure 9.4(i)(2)(B) because it contains 2,523 words, excluding the parts of the brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

2.  This brief complies with the typeface requirements of Texas Rule of Procedure 9.4(e) because this brief has been prepared in a proportionally spaced typeface using "Microsoft Word 2010" in fourteen (14) point "Times New Roman" style font.

*/s/ Laetitia Coleman Brown*
Laetitia Coleman Brown

## CERTIFICATE OF SERVICE

        I hereby certify that a true and correct copy of the foregoing document was forwarded via e-service on December 20, 2017, to the following counsel of record:


Joe Riddell
P.O. Box 41898
Austin, Texas 78704
(512) 663-4669
joeriddell@aol.com

***Counsel for Appellees***


        */s/ Laetitia Coleman Brown*
        Laetitia Coleman Brown

**IN THE COURT OF APPEALS FOR THE SECOND DISTRICT**
**FORT WORTH, TEXAS**

**THE CITY OF FORT WORTH**

Appellant,

**v.**

**MARY DEAL,**

Appellee.

**On Appeal from the 342nd District Court**
**of Tarrant County, Texas, Cause No. 342-289469-16**
**the Honorable Wade Birdwell, Presiding**

**INDEX TO APPENDIX TO BRIEF OF APPELLANT**

A.    Plaintiff's Original Petition—December 14, 2016.

B.    Order on City of Fort Worth's Plea to the Jurisdiction—November 15, 2017.

# APPENDIX A

342 289469 16

CAUSE NO. _____

FILED
TARRANT COUNTY

2016 DEC 14 PM 2:41

THOMAS A. WILDER
DISTRICT CLERK

| | | |
|---|---|---|
| MARY DEAL, | § | IN THE DISTRICT COURT |
| Plaintiff | § | |
| | § | |
| vs. | § | TARRANT COUNTY, TEXAS |
| | § | |
| CITY OF FORT WORTH, TEXAS, | § | |
| Defendant. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, MARY DEAL, (hereinafter referred to as "Ms. Deal" or "Plaintiff"), complaining of and about CITY OF FORT WORTH, TEXAS (hereinafter referred to as "City of Fort Worth" or "City" or "Defendant") because of the death of her son, Jakob Murray Lange, and for cause of action under the Texas Tort Claims Act would show the following:

### I.
### DISCOVERY CONTROL PLAN LEVEL

1.1    It is the Plaintiff's intent that Discovery be conducted under Level 3 of Rule 190 of the Texas Rules of Civil Procedure.

### II.
### JURISDICTION AND VENUE

2.1    Venue is proper in Tarrant County pursuant to §15.002(a)(3) of the Texas Civil Practice and Remedies Code, as the incident forming the basis of this lawsuit occurred in Tarrant County, Texas.

---

PLAINTIFF'S ORIGINAL PETITION                                                          Page 1

2.2 Subject matter jurisdiction for this cause rests with this Honorable Court as the amount in controversy exceeds its minimum jurisdictional requirements.

2.3 Plaintiff seeks monetary relief over $200,000 but not more than $1,000,000. Tex. R. Civ. P. 47(c)(4).

2.4 On February 6, 2015, Plaintiff filed a Complaint against the Defendant in the U.S. District Court for the Northern District of Texas relating to the death of her son Jakob at the conclusion of a police chase. That Complaint included a civil rights action under federal law and an action under the Texas Tort Claims Act (Texas Civil Practice & Remedies Code §§ 101.001 et seq.). On November 16, 2016, U.S. District Judge John McBryde entered a Memorandum Opinion and Order dismissing the civil rights claim with prejudice. (Document 72, Civil Action No. 4:15-CV-095-A, U.S. District Court, Northern District of Texas, Fort Worth Division.) He proceeded to dismiss the Plaintiff's claim under the Texas Tort Claims Act *without prejudice*, noting that "The taking of this action should not adversely affect plaintiff's ability to pursue this claim. 28 U.S.C. § 1367(d)." That statute provides for tolling of the statute of limitations, for the purpose of filing an action in a different court, for the time while a claim is pending plus 30 days following a dismissal, unless State law provides for a longer tolling period. Texas Civil Practice and Remedies Code sec. 16.064 in turn suspends the running of the limitations period through the 60th day after the date the dismissal becomes final.

### III.
### PARTIES AND SERVICE

3.1 Plaintiff, MARY DEAL, is a citizen of New Hampshire at all times relevant.

---

PLAINTIFF'S ORIGINAL PETITION

Page 2

CFW-Appellant Brief 026

Partial identification, pursuant to the Texas Civil Practices and Remedies Code is as follows: the last three numbers of Plaintiff's Social Security number are 584 and the last three numbers of her New Hampshire Driver's license are 201.

3.2     Defendant CITY OF FORT WORTH, TEXAS is a home rule municipality and may be served with process by and through its City Secretary, Mary J. Kayser, at City Hall, 1000 Throckmorton, Fort, Worth, Texas, 76102; telephone 817.392.6150.

## IV.
## FACTS

4.1     This lawsuit is a result of the death of Jakob Murray Lange, Plaintiff's son, following a vehicular chase begun when police observed Jakob speeding shortly after 1:30 AM on February 7, 2013.  Many facts are known to Plaintiff from public information requests and through discovery in federal court.  However, the City has not been forthcoming in numerous responses.  [For example, in addition to the City's failure to provide numerous documents and electronic communications, the audio of the radio traffic was compressed in time (thus making it impossible to tell exactly when words were said), the dash cam videos did not display time-of-day data (again preventing correlation with other events), and some of the dash cam videos stop abruptly while action continues.]  The City denies that a key event took place: the deployment of a tire deflation device ("TDD") that blew out Jakob's right-front tire, causing his fatal crash into a tree.  There is considerable evidence that a TDD was deployed, most strikingly the pattern of

PLAINTIFF'S ORIGINAL PETITION

Page 3

CFW-Appellant Brief 027

regularly-spaced punctures in the inside-sidewall of the tire, leading to the conclusion that the City has attempted to cover up its use.

4.2     Why would the City try to cover it up? Because its officers had ignored the rules for pursuits. The TDD was deployed at the culmination of a vehicle pursuit engaged in by several unsupervised City police officers who violated a number of departmental rules in the process. These rules are part of the Police Department's General Orders (cited below as "GO") adopted by the City. The rules recognize the dangers of pursuits and attempt to mitigate those dangers by detailed requirements, such as requiring a designated supervisor to direct the pursuit, limiting the police units that become involved, requiring lights and sirens be used, and requiring a continual re-evaluation of the risks of harm from the pursuit versus the harm from the loss of the suspect. Excerpts from the General Orders include:

A. "Vehicular pursuit of fleeing suspects can present a danger to the lives of members of the public, officers, and suspects involved in the pursuit." (GO 305.03.A)

B. "Prior to engagement of a pursuit, the officer shall determine whether the pursuit itself will bring a greater risk of harm to persons and property than the loss of the suspect and whether the apprehension of the suspect by other means are possible." (GO 305.03.A)

C. "The decision to pursue must be based upon facts and circumstances known to the officer at the time the officer begins the pursuit." (GO 305.03.C.1)

D. A pursuit may be justified under either of two circumstances. "Any officer in an authorized

PLAINTIFF'S ORIGINAL PETITION                                                    Page 4

emergency vehicle may initiate a pursuit … when a suspect exhibits the intent to avoid apprehension by refusing to stop when properly directed to do so. Pursuit also may be justified if the officer reasonably believes that the suspect, if allowed to flee, would present a danger to human life or cause serious injury." (GO 305.03.C.2)

E. "The emergency warning lights, siren, and emergency vehicle headlights shall be used at all times during a pursuit." (GO 305.03.D.2)

F. "The in-car audio/video system shall be used at all times during a pursuit, if the vehicle is so equipped." (GO 305.03.D.3)

G. "Upon engaging in a pursuit, the officer shall notify the dispatcher of the following: a. Unit number and type … of primary pursuit vehicle; b. Location and direction of travel; c. Reason for pursuit; d. Any relevant road/weather conditions; and e. Description of the pursued vehicle and number of occupants." (305.03.D.7)

H. "Upon initiation of a pursuit, police communications shall ensure that a field supervisor or watch commander from the district … is immediately notified and briefed regarding the circumstances surrounding the pursuit. This person shall serve as the designated supervisor for the duration of the pursuit … ." (GO 305.03.E)

I. "After being made aware of a vehicular pursuit … , the designated supervisor shall: 1. Make a determination as to whether the pursuit will be allowed to continue; 2. Announce that determination over the radio; 3. Monitor incoming information that may affect the officer's

PLAINTIFF'S ORIGINAL PETITION                                                    Page 5

CFW-Appellant Brief 029

determination about whether the pursuit should continue; 4. Immediately terminate the pursuit when conditions dictate that such action should be taken; 5. Coordinate and direct activities as needed to ensure that proper procedures are followed; and 6. Upon termination of a pursuit, respond to the location where a vehicle has been stopped." (GO 305.03.E)

J. "Officers shall not continue a pursuit without authorization from a supervisor over the radio." (GO 305.03.C.4)

K. "Unless circumstances dictate otherwise, a pursuit will consist of no more than three (3) police vehicles: a primary pursuit unit, a secondary pursuit unit and a supervisor ... . No other personnel shall engage in a pursuit, unless instructed to participate by a supervisor." (GO 305.03.D.8)

L. "Units other than the primary and secondary vehicles may parallel a pursuit only if directed to do so by the dispatcher or the designated supervisor. Units paralleling a pursuit shall do so in compliance with all traffic laws." (GO 305.03.G.3)

M, "Safety of the involved officers, third parties, property and suspects is critical at the termination of a pursuit. The designated supervisor and primary pursuit unit shall continually re-evaluate and assess the pursuit situation, including all factors considered when initiating the pursuit, and shall terminate the pursuit whenever the designated supervisor or primary pursuit unit reasonably believes the risks associated with the continued pursuit are greater than the public safety benefit of making an immediate apprehension." (GO 305.03.J.1)

PLAINTIFF'S ORIGINAL PETITION                                                   Page 6

CFW-Appellant Brief 030

N. "No officer shall deploy or attempt to deploy tire deflation devices (TDD) unless they have completed department approved training on their use. Officers shall not deviate from departmental guidelines and training methods." (GO 305.03.H.1)

O. "The safety of all officers, citizens, and violators shall be of the utmost concern before and during the use of the tire deflation devices. If feasible, prior to deployment of TDD, officers shall notify pursuing units of TDD deployment location." (GO 305.03.H.2)

P. "Officers shall consider visibility of pursuit, traffic and pedestrian congestion and weather and road conditions prior to deployment of TDD." (GO 305.03.H.5)

4.3    But for the negligent actions of the police officers, including their disregard for the rules for pursuits, the chase would have ended long before Jakob was killed. The police failed in their duty to continually balance the dangers of the pursuit versus the harm of letting Jakob go. No supervisor came on the radio to direct the pursuit, as required. The officers were required to, but did not, stop the chase when the supervisor did not authorize its continuation. In fact, the officer leading the pursuit, Officer T. Shelton, has stated that, although the supervisor might have called off the pursuit, no supervision was necessary and that the decision to continue the pursuit was his. At least five other officers in four vehicles joined the chase without being authorized, as required, by the dispatcher or the supervisor. No supervisor authorized the use of a tire deflation device, but two different officers intended to deploy a TDD to halt Jakob's car, both at unsuitable locations due to turns or curves in the road and trees near the curbs. One, Officer M. Putnam, was unable to deploy it on time (as shown on video), and the other, Officer

CFW-Appellant Brief 031

M. Mendoza, announced on the radio that he planned to "spike" at the fated intersection but later said he could not get there in time.

4.4     At all times relevant, Jakob Murray Lange was a resident of Fort Worth, Texas. He was a young man of 24 years of age and had recently graduated from the University of North Texas, with Honors, in August 2012. He was not married and had no children.

4.5     Jakob was an aspiring musician, and late February 6, 2013, he went to a local club in the vicinity of Texas Christian University and performed at an "open mic." In the early morning hours of Thursday, February 7, 2013, Jakob left the club and was driving southbound on South University Drive.

4.6     As Jakob passed the intersection of South University Drive and West Berry, two Fort Worth Police ("FWPD") officers in separate units, Officers Thomas Shelton and Robert Mask, observed Jakob proceeding southbound. Officer Shelton determined that Jakob was speeding. Officer Shelton pulled out onto South University Drive and sped to catch up with Jakob, initiating the pursuit. (However, he did not report the pursuit to the dispatcher, as required by GO 305.03.D.7, until he was more than a mile down the road.) Officer Mask followed.

4.7     For the initial portion of the pursuit, despite driving at speeds in excess of the speed limit, neither FWPD vehicle engaged its emergency lights or siren. ("The emergency warning lights, siren, and emergency vehicle head lights shall be used at all times during a

CFW-Appellant Brief 032

pursuit." GO 305.03.D.2).

4.8    Jakob made a prohibited left turn from South University Drive to Granbury Road. The pursuit vehicles followed Jakob through the same prohibited left turn. After chasing Jakob for over a mile and for more than one minute without turning on their emergency lights or sirens, the pursuing vehicles finally engaged their emergency lights. Jakob failed to pull over, and Officer Shelton finally reported the pursuit to the dispatcher, saying, "He's failing to yield." Officer Shelton then turned on his siren.

4.9    The dispatcher was then required to notify the supervisor assigned to that area so that he could direct the pursuit. While the City has not provided any record that the designated supervisor, Sergeant W. Traverso, was notified, the City has claimed that he "monitored" the pursuit. However, he was required by the General Orders to do much more than simply monitor the pursuit. In fact, once made aware of the pursuit, the supervisor was required to make a determination as to whether the pursuit would be allowed to continue and announce that determination over the radio. Sergeant Traverso was supposed to coordinate and direct activities as needed to ensure that proper procedures were followed. In making the determination on continuing the pursuit, "Safety of the involved officers, third parties, property and suspects is critical at the termination of a pursuit. The designated supervisor and primary pursuit unit shall continually re-evaluate and assess the pursuit situation, including all of the factors considered when initiating the pursuit, and shall terminate the pursuit whenever the designated supervisor or primary pursuit unit reasonably believes the risks associated with continued pursuit are greater

---

PLAINTIFF'S ORIGINAL PETITION

Page 9

than the public safety benefit of making an immediate apprehension." (GO 305.03.J.1) The supervisor was to monitor information and immediately terminate the pursuit when conditions dictate that such action should be taken. Sergeant Traverso never got on the radio, neither to announce whether the pursuit could continue nor to direct the pursuit.

4.10    At least four other FWPD vehicles, including five police officers, joined the unsupervised pursuit without supervisor authorization. Officer C. Simmons is listed on an incident log as responding to the pursuit. Plaintiff has been unable to determine his ultimate role, as the City has never provided the requested dash cam from his vehicle or other specific information. Lieutenant J. G. White wrote in a report that he saw Jakob speed through the intersection of University and Berry from a block or so away and "drove toward the area of the pursuit, but was never able to get close enough." Again, the City has not provided the requested dash cam video from his vehicle. Officers M. Putnam and G. Miller in one vehicle and Officer M. Mendoza in another vehicle converged from separate directions on the route of the pursuit. As detailed below, both intended to deploy TDDs without any supervisor's authorization. Incidentally, despite the failure to supervise this pursuit by Sergeant Traverso, and despite the unauthorized participation by these officers, no FWPD officer was disciplined in relation to the pursuit of Jakob Lange. In fact, in the Vehicle Pursuit Report for this incident, the reviewing chain of command (which included a Sergeant, a Lieutenant, a Captain, and an Acting Major) stated that pursuit policy and procedure were followed. This whitewash of the unsupervised fatal police pursuit is hardly surprising, as Sergeant Traverso, who had failed to supervise it, wrote the

---

CFW-Appellant Brief 034

initial narrative about the pursuit. He had no desire for further scrutiny of the pursuit.

4.11   About two-thirds of the way through the pursuit, Officers Putnam and Miller stopped on the side of Granbury Road to deploy a tire deflation device, just east of its T-intersection with Trail Lake Drive. This patrol unit had not been requested to join the pursuit and had not been authorized by the supervisor to deploy a tire deflation device. It had also not warned the other police cars of the planned deployment of the TDD. Nevertheless, Officer Putnam tried to get a tire deflation device out of his patrol car's trunk. He was unable to deploy it in time, and the pursuit bypassed this unit.

4.12   Near the end of the pursuit, Officer Mendoza stated over the police radio, "Comes out to Bellaire. We're gonna spike at Bellaire." Again, this patrol unit had not been requested to join the pursuit and had not been authorized by the supervisor to deploy a tire deflation device. A short while later, Officer Mendoza seems to say over the radio, "I'm not gonna get there in time." Incidentally, the dash cam video from Mendoza's unit stops abruptly about 4/10 of a mile before the crash scene. It has no audio tract and no time stamp; so Plaintiff has been unable to correlate its events with others. Regardless of whether Officer Mendoza was the person who deployed the TDD that night, the fact that not only he but also another pair of police officers tried to intercept the pursuit route and to deploy TDDs without authorization provides plausibility to the existence of some officer who was able to show up in time to deploy at the fated intersection.

PLAINTIFF'S ORIGINAL PETITION                                                    Page 11

CFW-Appellant Brief 035

4.13    The pursuit lasted less than 6 minutes. Upon entering the intersection of Overton Park East and Bellaire Drive South, Jakob's vehicle appeared to strike an object and he lost control of his vehicle. Unable to negotiate the curve, he struck a tree. Jakob suffered severe injuries and succumbed to his injuries, dying the following day, February 8, 2013.

4.14    Upon investigation into Jakob Lange's wrecked vehicle, there appears to be damage to the right front tire consistent with the use of a tire deflation device, also known as a "Stop Stick" or "spikes." ("Stop Stick" is the model of TDD used by the Fort Worth Police Department and is standard equipment in patrol cars.) In addition to a tire on Jakob Lange's car being deflated and with markings consistent with the use of a Stop Stick, a FWPD patrol unit responding to the pursuit also suffered a punctured tire at the scene, and required assistance in changing the tire. Based on the damage to the right front tire of Jakob Lange's car consistent with the use of a tire deflation device, the damage to a FWPD patrol car tire at the location of the wreck, and expert opinions regarding the cause of the wreck and the damage to Jakob Lange's car, it appears that a tire deflation device was deployed by an unauthorized, unsupervised and unknown-to-Plaintiff Fort Worth police officer at the intersection of Overton Park East and Bellaire Drive South at a time when Jakob Lange was traveling approximately sixty miles per hour heading into a dark curve in a tree-lined road. This was a very dangerous situation in which to deploy a TDD. The TDD, a tangible object, was negligently deployed. It was apparently deployed contrary to the City's training and the manufacturer's instructions. A typical Stop Stick consists of a 9 or 12 foot long cloth sleeve holding three or four 3-foot long sections of styrofoam, each with 36 embedded spikes, attached to a cord and reel to position the TDD.

PLAINTIFF'S ORIGINAL PETITION                                              Page 12

The 3-foot long sections have a triangular cross section, with 12 spikes (evenly spaced about 3 inches apart) positioned to puncture from each of three orientations. The manufacturer, Stop Tech, warns, "Do not hold the cord in the air, or the cord could get caught in the frame of the vehicle." The Stop Stick became entangled on the right front wheel of Jakob's Honda, wrapping around the inside sidewall and putting about 20 punctures or marks in it, evenly spaced about 3 inches apart, the same distance apart as the spikes in a Stop Stick facing in each of its three orientations. The TDD blew out Jakob's right-front tire, causing his front-wheel drive vehicle to veer to the right while the tree-lined street curved left. Jakob hit the curb and then a tree, suffering fatal injuries.

4.15    As the Honda veered from the center of the street over to the right curb, it left a line more than 50 feet long of fresh gouges in the pavement. These gouges were from the rim of the right front wheel and/or the TDD stuck around the wheel. There are police photos of the gouges, and their line is shown in a diagram of the crash scene. Along with a big dent in the rim from directly hitting the curb, the gouges prove that the right front tire had been blown out well before the Honda crashed into the curb or the tree. However, the narrative of the City's official crash report makes no mention of the gouges, and their line is not labeled on the diagram. By ignoring the direct cause of Jakob's loss of control, the blown-out tire, the City avoided having to investigate or address what caused the blow-out, i.e., a TDD. Instead, the City's report lists speeding and fleeing or evading police as the causes of the accident. This is another aspect of the City's attempt to hide what happened that night.

4.16    The crash and death of Jakob Lange was a foreseeable consequence of the

CFW-Appellant Brief 037

unauthorized and unsupervised intervention in the pursuit by an unknown police officer and his negligent deployment of a tire deflation device. The negligent actions of the City's police on February 7, 2013, were the product of the City's history of negligence in the training and supervision of its police officers with regard to pursuing vehicles and deploying tire deflation devices. It was foreseeable that the City's inadequate training and supervision would result in an unsupervised police officer's making negligent decisions about where, when, and how to deploy a TDD, decisions that caused Jakob Lange's death.

4.17    The City of Fort Worth was negligent in the training of officers in the use of City-owned property, namely, tire deflation devices. The City failed to educate its officers sufficiently regarding the risks associated with the deployment of tire deflation devices and the circumstances in which these potentially lethal devices should not be deployed. The City's training for deploying TDDs has consisted primarily of using the written materials and a video provided by Stop Tech, the maker of Stop Sticks. These materials warn about risk factors but do not quantify them. The City provides only a single demonstration on use of Stop Sticks in the police academy, with no continuing practice or training whatsoever. This is contrary to the manufacturer's safety guidelines stating that Stop Sticks should not be used without proper training and Stop Stick use should be frequently practiced so officers are prepared to properly deploy them in pursuits. FWPD officers never practice proper deployment of Stop Stick after the academy demonstration.

4.18    The General Orders for pursuits require a continual balancing of the risks of

CFW-Appellant Brief 038

continuing the pursuit versus the potential harm if the suspect is allowed to flee. But the City neglects in its training to provide any perspective on the range of outcomes of police pursuits or statistics about the frequency of bad consequences. One of Plaintiff's experts has opined that it is more likely than not that Jakob Lange would have slowed down and not been involved in the crash had the officers terminated their chase of Jakob Lange. Research has demonstrated that when a police officer terminates the active chase of a suspect, the suspect will slow down, often blending into traffic or in some cases abandoning the vehicle. It is well known that a suspect will most likely continue to flee as long as the police continue to chase. Therefore, it is more likely that when a police officer terminates his or her chase, the suspect will slow down. However, the coordinator of the City's law enforcement driving training since 2010 does not personally agree with that research.

4.19    One further aspect and consequence of the City's negligence on February 7, 2013, is that the alternative of using the police helicopter was not employed. Air One (the police term for their helicopter) was brought into the pursuit quite promptly by the dispatcher. One of Plaintiff's experts has stated that, as an alternative, the police should have discussed a strategy with Dispatch to trap the car by blocking the way, with the help of a helicopter overhead.

4.20    The pursuit of Jakob Lange is a tragic example of the City's negligence in enforcing its General Orders and supervising its officers by failing to "ride herd" on its officers participating in pursuits. The General Orders state, "These procedures must be viewed as an administrative guide for decision-making before the fact and as a standard for administrative

PLAINTIFF'S ORIGINAL PETITION                                      Page 15

judgment of the propriety of actions taken relating to emergency vehicle operations." (GO 305.01.A) However, the officers are also taught unwritten tactics that directly violate the General Orders and negate the protections of public safety that the General Orders are designed to insure. For example, officers are informally encouraged to converge on the route of a pursuit (which constitutes paralleling, prohibited by the General Orders unless directed by the dispatcher or the supervisor), even without authorization, ostensibly so they could assist at the pursuit's termination if there are multiple suspects in the vehicle. This can create more danger than the behavior that prompted the pursuit. For example, during Jakob's pursuit, Officer Mendoza drove almost 90 miles per hour along South University Drive without his lights or siren on, and almost 70 mph along West Berry again without his lights or siren on, as he tried to catch up with the pursuit. The Vehicle Pursuit Report, the supposed mechanism for the chain of command to review what happened, makes no mention of the four other police units that joined the pursuit without authorization and thus the report does not examine the propriety of their tactics.

4.21 It is significant to note that during the entirety of the pursuit, the primary factor creating reasonable suspicion justifying a stop was suspected excessive speed. After the initial report of the incident by Officer Shelton, the City claimed that pedestrians in the vicinity were in danger from Jakob's driving. However, there were no people present within view of the patrol cars' dash cam recordings. Further, at no time was another vehicle struck, there were no other vehicles on the road of travel as Jakob failed to yield and continued, and no officer was placed in a dangerous or threatening position by Jakob – other than those engaged in the pursuit. At no

PLAINTIFF'S ORIGINAL PETITION                                         Page 16

time relevant to the time frame immediately preceding the pursuit was there any report of criminal activity involving a vehicle matching the description of the vehicle driven by Jakob Lange. He was not such a danger to the public that he should have been killed.

## V.
## CAUSE OF ACTION UNDER TEXAS TORT CLAIMS ACT

5.1    Plaintiff incorporates by reference all factual allegations of paragraphs 4.1 through 4.21 above as though fully set forth at length herein. Pursuant to the provisions of Texas Civil Practice & Remedies Code §§ 101.001 *et seq.*, (the "Texas Tort Claims Act"), Defendant City of Fort Worth is liable for its own negligence and that of its employees, including its agents and officers, toward Jakob Lange, in that its negligent actions were carried out through the negligent use of tangible property, specifically, the deployment of a tire deflation device.

5.2    The City of Fort Worth has waived immunity from suit under the provisions of the Texas Tort Claims Act because the death of Jakob Lange resulted from the use or misuse of tangible personal property, in that the tire deflation device that caused and/or contributed to cause the death of Jakob Lange was the property of the City and was used by the City of Fort Worth and/or its agents.

5.3    Plaintiff specifically denies and disavows any claim or allegation that the damages suffered by Plaintiff are the result of any intentional tort. Plaintiff does not claim or allege that Defendant City or any agent of Defendant intentionally caused harm or damage to Jakob Lange or intentionally caused any harm or damage to Plaintiff. An unknown police officer's intent to cause a slow deflation of Jakob's tire (as the Stop Stick is designed, intended,

PLAINTIFF'S ORIGINAL PETITION                                            Page 17

CFW-Appellant Brief 041

and advertised to do by its manufacturer) did not include an intent to harm Jakob physically (indeed, kill him) or harm or damage Plaintiff. Likewise, Defendant has never claimed or alleged it or any of its agents intentionally caused harm or damage to Jakob Lange or intentionally caused any harm or damage to Plaintiff.

5.4    Pursuant to Texas Civil Practice & Remedies Code § 101.101, Plaintiff has given Defendant City of Fort Worth notice of her claim; however, pursuant to Texas Civil Practice & Remedies Code § 101.101(c), Plaintiff was not required to provide City of Fort Worth with such notice.

## VI.
## DAMAGES FOR PLAINTIFF

6.1    Due to the negligent acts of Defendant, Ms. Deal has suffered the loss of her son, Jakob Murray Lange, and thus, the loss of society and companionship, emotional distress, and mental anguish in the past and continues to do so at present.

6.2    Plaintiff is entitled to damages pursuant to Texas Civil Practice & Remedies Code §§ 101.001, *et seq*.

6.3    Plaintiff seeks such other and further relief, general and special, legal and equitable, to which she may show herself justly entitled.

6.4    Plaintiff requests costs of court and expenses.

6.5    Plaintiff requests prejudgment interest.

6.6    Plaintiff requests post judgment interest.

---

PLAINTIFF'S ORIGINAL PETITION                                             Page 18

## VII.
## REQUEST FOR DISCLOSURE

7.1    Under Texas Rule of Civil Procedure 194, Plaintiff requests that Defendant disclose, within fifty (50) days of the service of this request, the information or material described in Rule 194.2 (a) – (l).

## VIII.
## JURY DEMAND

8.1    Plaintiff demands a jury trial.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully prays that the Defendant be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff for:

    a.    damages in an amount within the jurisdictional limits of this Court;

    b.    pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by law;

    c.    post-judgment interest at the legal rate;

    d.    costs of the Court; and

    e.    such other and further relief to which Plaintiff may be entitled at law or equity.

Respectfully submitted,

*/s/Mary Deal*
MARY DEAL
22 White St., Concord, NH 03301
Telephone: 603-738-8602    Facsimile: none
maryrdeal@aol.com

PRO SE PLAINTIFF

PLAINTIFF'S ORIGINAL PETITION                              Page 19

# APPENDIX  B

CAUSE NO. 342-289469-16

FILED
TARRANT COUNTY
11/6/2017 10:51 AM
THOMAS A. WILDER
DISTRICT CLERK

| | | |
|---|---|---|
| MARY DEAL<br>*Plaintiff* | §<br>§<br>§ | IN THE DISTRICT COURT |
| Vs | §<br>§ | TARRANT COUNTY, TEXAS |
| CITY OF FORT WORTH, TEXAS<br>*Defendant* | §<br>§<br>§ | 342ND JUDICIAL DISTRICT |

## ORDER ON CITY OF FORT WORTH'S PLEA TO THE JURISDICTION

On November 2, 2017, the Court heard and considered Defendant City of Fort Worth's Plea to The Jurisdiction. Counsel for the City of Fort Worth, Laetitia Coleman Brown appeared. Counsel for Plaintiff, Joe Riddell appeared. After considering the arguments of both parties, evidence presented and the pleadings on file, the Court is of the opinion that Defendant City of Fort Worth's Plea to The Jurisdiction should be GRANTED in part and DENIED in part.

Accordingly, it is **ORDERED, JUDGED AND DECREED** that Defendant City of Fort Worth's Plea to The Jurisdiction is hereby GRANTED on the claims of:

Negligent Entrustment;

Negligent Supervision and Training;

And is hereby DENIED on the claims of:

Intentional Tort; and

Official Immunity.

E-MAILED
_Riddell, Brown,_
_Winter_

The Court FURTHER ORDERS that any further action in this case is STAYED pending appeal of this order.

SIGNED this 15th day of November, 2017.

_____
Judge Presiding